# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 1, 2009 Session

## ROY E. KEOUGH v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-24323     Carolyn Blackett, Judge**

---

**No. W2008-01916-CCA-R3-PD - Filed June 30, 2010**

---

Petitioner Roy E. Keough appeals as of right the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief. On May 9, 1997, a jury found the Petitioner guilty of the premeditated murder of his wife, Betty Keough, and the attempted first degree murder of Kevin Berry. For the murder conviction, the jury found that the Petitioner had previously been convicted of one or more felonies for which the statutory elements involve the use of violence to the person. See T.C.A. § 39-13-204(i)(2). The jury further found that this aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt. The jury then sentenced the Petitioner to death. The trial court imposed a forty-year sentence for the attempted murder conviction to be served consecutive to his sentence of death. The Petitioner's convictions and sentences were affirmed on direct appeal by the Tennessee Supreme Court. See State v. Keough, 18 S.W.3d 175 (Tenn. 2000). On December 12, 2000, the Petitioner filed a *pro se* petition for post-conviction relief. An amendment was filed on February 14, 2003, and an addendum to the amended petition was filed on November 6, 2007. The post-conviction court held hearings on various dates in September, October, and November 2007. On July 23, 2008, the post-conviction court entered an order denying relief. On appeal to this Court, the Petitioner presents a number of claims that can be characterized in the following categories: (1) the Petitioner's trial counsel were ineffective, (2) the Petitioner's appellate counsel were ineffective; (3) the Petitioner was denied a fair trial and (4) Tennessee's death penalty statutory scheme is unconstitutional. Following a thorough and exhaustive review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Donald E. Dawson and Sara Willingham, Nashville, Tennessee, for the appellant, Roy E. Keough.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael Moore, Solicitor General; James E. Gaylord, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts Underlying the Petitioner's Convictions

The following facts are excerpted from our supreme court's opinion affirming the Petitioner's convictions and sentence:

### Guilt Phase

The defendant, Roy Keough, and his estranged wife, Betty Keough, were separated following a stormy marriage of two years that was beset with problems and arguments. After the separation, the defendant and his girlfriend rented a room at the home of his girlfriend's brother, Bobby Holly. In December of 1995, the defendant moved out of the residence, and Kevin Berry, a friend of Holly's, moved in.

On December 24, 1995, the victim, Betty Keough, visited the Holly residence several times looking for the defendant. At around 11:30 a.m., the victim told Holly that she had a gun in her car; she threatened to kill the defendant and his girlfriend if she found them. She returned around 3:00 p.m.; she appeared to have been drinking, but she did not make any threats during this visit. Sometime after the victim left, the defendant stopped by the Holly residence. Kevin Berry told the defendant that the victim was looking for him. The defendant left.

The victim returned to the Holly residence for the third time around 8:30 p.m. She asked Kevin Berry to join her for a drink at a neighborhood bar. Although the two had not met before that day, Berry accepted the offer. The two drove to Irene's Grill in the victim's car. Shortly after they departed, the defendant stopped by the Holly residence to see if the victim had returned. Holly told the defendant that the victim and Berry had gone to Irene's Grill. The defendant seemed calm and did not appear to have been drinking. Holly

testified that the defendant appeared to have parked his car where it could not be seen.

The victim and Berry were seated at a table drinking beer when the defendant arrived at Irene's Grill. According to witnesses, the defendant and the victim began "talking loud" and appeared to have an argument. Berry testified that the defendant got "louder and louder" and wanted to know what the victim was doing there. The owner of the bar did not hear the victim and the defendant arguing, but she nonetheless asked them to leave the bar. She testified that the defendant did not appear to be drunk, but she refused to serve him a beer. The defendant, the victim, and Berry walked through a hallway toward the back door. According to one witness, the victim appeared to push either the defendant or Berry.

Berry testified that the defendant and the victim continued to argue as the three walked to the victim's car in the parking lot. The defendant asked Berry to drive his car back to the Holly residence; Berry, who had been drinking a beer, declined. Berry testified that the defendant then "pushed [the victim] with both hands" with "some force behind it." When Berry stepped forward to intervene, the defendant stabbed him in the chest with a knife. Berry tried to run but was pursued by the defendant and stabbed in the thigh. Berry pushed the defendant away and ran toward the bar; the defendant again caught him and stabbed him in the back. Berry somehow managed to escape into the bar where individuals tended to his wounds and called police.

Officer James Currin arrived at the scene at approximately 10:00 p.m. After checking on Berry's condition and talking to individuals in the bar, he went outside to the parking lot and found the victim in her car slumped over the steering wheel. She was not moving. There was blood on her face and on the seat of the car. The car doors were locked. Currin broke out the rear window of the car so paramedics could examine the victim and confirm that she was dead.

Martha Stephenson, the defendant's girlfriend, testified that she had lived with the defendant off and on for about twenty years. The defendant called her at her daughter's home around 9:30 p.m. and asked for money for gasoline. She borrowed ten dollars from her daughter and went to the Holly residence but was unable to find the defendant. She returned to her daughter's home, where she found the defendant in the driveway. The defendant told her that "he had just stabbed his wife and her boyfriend" and that he had thrown

the knife away. When she told the defendant that she did not have any money, he said he would just wait on the police.

Stephenson's daughter, Mary Stokes, testified that the defendant showed up at her home and asked to borrow money. She told the defendant she did not have any money. The defendant said that he and the victim had a fight. The defendant asked for a drink and went outside to "wait for the police." He drank half a fifth of vodka and also some rum. The defendant asked to use the phone to call his attorney. Stokes testified that she heard the defendant say that he had "stabbed his wife" and that "she was probably dead." An officer later arrived and arrested the defendant. The arresting officer testified that the defendant asked him, "which one did I get ?"

The defendant gave a statement to Detective James Nichols the next day. Nichols testified that he read the defendant his *Miranda* rights and that attorney Leslie Ballin was present for the interview. According to Nichols, the defendant said he had been looking for his wife when he found her in the bar with another man. They became involved in a verbal dispute and were asked to leave by the management of the bar. Nichols testified that the defendant told him that the argument with the victim escalated once they went outside and that he stabbed the victim with a rifle knife. The defendant also told Nichols that he also stabbed the man who was with his wife at the time. The defendant further said, however, that "[h]e was angry or ... his emotions were so high he couldn't remember how many times or where he had stabbed his wife or where he had stabbed the man that was with his wife."

A forensic pathologist testified that the victim, age forty-two, sustained a large stab wound at the top of her breastbone, which penetrated almost six inches into her chest cavity. The wound inflicted upon her probably did not immediately render her unconscious; death probably occurred within two to five minutes. The wound was consistent with that caused by a bayonet used with a moderate amount of force. There were no other wounds on the victim of a defensive nature.

Several witnesses, including three who were present at Irene's Grill, testified during the defendant's proof. Joanne Waine testified that she did not see any argument or pushing between the defendant and the victim. Lisse Moore testified that she believed the victim may have pushed the defendant as they walked out of the bar. Virginia Walden testified that she saw the victim slap the defendant while still inside the bar. Bobby Holly testified that the

victim had been looking for the defendant on the day in question. She told Holly that she would kill the defendant and his girlfriend if she found them. Holly contacted the defendant and told him about the threat.

After deliberating on the charges, the jury convicted the defendant of premeditated first degree murder and attempted first degree murder.

### Sentencing Phase

Joyce Smart, the victim's sister, testified that the victim's first husband died after he and the victim had been married for twenty-three years. The victim met the defendant several months later, and they eventually married. The victim was a grandmother and a very friendly woman. Ms. Smart concluded that "our Christmases will never be the same."

The prosecution introduced court records indicating that the defendant was convicted of assault to commit voluntary manslaughter in Tennessee in 1974 and of manslaughter in Mississippi in 1989.

Several witnesses testified on behalf of the defendant. The defendant, fifty-three years old, was one of eight children. Two of the defendant's sisters asked the jury to spare his life. Although the defendant was generally cordial and nice, he and the victim had a "stormy" relationship. William Powers testified that he worked with the defendant at a body shop for six or seven years. On one occasion, the victim showed up at work, argued with the defendant, and tried to hit the defendant with an air ratchet.

The jury found that the prosecution had proven one aggravating circumstance that the defendant was previously convicted of one or more felonies whose statutory elements involve the use of violence to the person. Tenn. Code Ann. § 39-13-204(i)(2) (1997 & Supp.1999). The jury also found that the evidence of this aggravating circumstance outweighed evidence of any mitigating circumstances beyond a reasonable doubt and therefore imposed a sentence of death. In a separate sentencing proceeding, the trial court imposed a forty year sentence as a Range II offender for the attempted first degree murder, to run consecutively. The Court of Criminal Appeals thereafter affirmed the convictions and the sentences.

Keough, 18 S.W.3d at 178 -180.

**Proof at Post-Conviction Evidentiary Hearing**

A hearing on the petition for post-conviction relief was held in the Shelby County Criminal Court. During this hearing, the following proof was presented.

Gary Looney, Chief of Police in Byhalia, Mississippi, testified that in February 1989 he was the Chief Deputy of the Marshall County Sheriff's Department. Chief Looney was involved in the investigation of the murder of Robert E. Lee. Chief Looney responded to the crime scene, where he discovered the victim Robert E. Lee laying in the floor of the mobile home. Roy Keough, two other women and a child were also in the mobile home. There was no electricity in the mobile home. The home was in disarray and there were visible signs that there had been alcohol consumption. A rifle and ammunition were present. Chief Looney remarked that the adults present were inebriated. He identified the adult persons present as Roy Keough, Betty Keough, and Evone Perkins. The Betty Keough present at the incident in Mississippi is not the same Betty Keough who was the victim of the Petitioner's Tennessee murder conviction. Robert E. Lee was the Petitioner's brother-in-law. Evone Perkins was Betty Keough's cousin. Robert E. Lee later died as a result of the gunshot wound.

Chief Looney related that the Petitioner was arrested two days after the homicide and that he took a statement from the Petitioner. The Petitioner later entered a guilty plea to voluntary manslaughter.

Joseph Crenshaw testified that he was the shop foreman at Tom Martin's Body Shop in Memphis. The Petitioner worked as a body man at the shop for six to eight years. Mr. Crenshaw stated that he had also worked with the Petitioner's brother, Charles, at another body shop. Charles Keough had an alcohol problem. Mr. Crenshaw stated that Charles "had to have a quite a bit [of alcohol] to [drink] every day" in order to work. In fact, Charles would drink during the work day. Mr. Crenshaw explained that, if Charles "didn't have a certain degree to drink during [the] day he wouldn't make the full day."

Joseph Crenshaw testified that, when the Petitioner arrived for work in the mornings, he could tell "whether he had a good bit to drink the night before and had some overlap during the day because he would leave during the morning sometimes and disappear for a while . . . in a little while he'd come back and you could tell he'd gone and gotten something to drink." Mr. Crenshaw also stated that sometimes he would smell alcohol on the Petitioner's breath when he came to work in the mornings. Mr. Crenshaw stated that, as long as the Petitioner had a "good bit of alcohol," he would do his work and "he did real good work." Mr. Crenshaw stated that defense counsel never contacted him prior to the

-6-

Petitioner's May 1997 trial. On cross-examination, Mr. Crenshaw clarified that the time period he testified to was in the late 1970s and early 1980s.

Bobby Holley was a witness at the Petitioner's 1997 trial. He explained that he had met the Petitioner through his sister Ann Stevenson. The Petitioner lived with Mr. Holley for three to four months. Mr. Holley stated that the Petitioner "would usually be drinking." He explained that the Petitioner would typically be drinking but would not appear drunk.

At the Petitioner's trial, Mr. Holley testified that he saw the Petitioner on December 24, 1995. Mr. Holley testified that the Petitioner did not appear intoxicated. At the post-conviction hearing, Mr. Holley explained that he never could tell whether the Petitioner had been drinking. Mr. Holley testified that, on December 24, 1995, he also saw the victim Betty Keough several times. At trial, he testified that Betty Keough appeared agitated. Mr. Holley also testified that Betty Keough appeared to have been drinking. He confirmed that his testimony was basically to establish that the Petitioner's "angry drunk estranged wife" came over to his home looking for him. Mr. Holley stated that the Petitioner was the type of individual who never appeared drunk but who always was drinking.

Dallas Moore is the owner of Blackie's Auto Body Collision. He testified that the Petitioner worked at Blackie's in the late 1960s, the early 1970s, and again in the early 1980s. Mr. Moore testified that the Petitioner was a good body man. He added, however, that the Petitioner had an alcohol problem. Mr. Moore stated that the Petitioner would become belligerent and was even fired on at least two occasions. He recalled that the Petitioner would take long lunch breaks and then would not want to work the rest of the day. Although he could not recall a specific occasion in which the Petitioner was drinking on the job, he did observe the Petitioner's demeanor at work. He stated that he was afraid to fire the Petitioner. Mr. Moore testified that the Petitioner's drinking "made him dangerous."

John Keough, the Petitioner's brother, testified that he is ten years older than the Petitioner. John Keough explained that Dorothy was the oldest child, then Charles, Carolyn, John, Regina, Eleanor, the Petitioner, and Judy. Of the eight children, Charles and Carolyn were deceased. John Keough testified that they were raised on a farm out near Collierville, Tennessee. He stated that the family moved to Pennsylvania in the late 1930s so their father could seek work in the coal mines. They remained in Pennsylvania for a short time and then returned to Tennessee. When their grandfather passed away, their father inherited the farm. They worked on the farm until 1950 or 1951. John Keough explained that their father had to sell the farm due to financial burdens. Their father then ran a type of general store and drove a school bus. John Keough related an incident where the Petitioner was caught drinking whiskey when he was about five years old.

John Keough testified that the Petitioner left school when he was fifteen years old. The Petitioner moved in with their brother Charles, and Charles got the Petitioner a job in an automotive body shop. John Keough stated that Charles Keough had served in the service during the Korean War. After the service, Charles went to school to learn automotive body repair and worked in that field most of his life. Charles Keough drank alcohol "pretty regularly," "[i]n fact, he was an alcoholic." John Keough testified that when Charles drank "he would get argumentative and belligerent." Charles Keough quit drinking around 1980.

John Keough stated that their father drank and that he would also consider him to be an alcoholic. Their father drank whiskey and would drink it with water or coke. He added that their father would become argumentative when he drank.

In 1971, John Keough and the Petitioner went into business together, opening a body fender repair shop. He stated that the business failed because they did not have the insurance business that a body shop needs to succeed. He added that the Petitioner left the business first. After 1971, John spent little time with the Petitioner.

John Keough stated that he was never contacted by the Petitioner's trial counsel. He stated that he would have talked with them and that he would have been available to testify at trial. He stated that he knew that the Petitioner had been arrested and sent to prison in Mississippi. He stated that he did not visit the Petitioner while he was incarcerated in Mississippi. John Keough stated that he saw the Petitioner on at least one occasion after he got out of prison in Mississippi. He was aware of the Petitioner's arrest in Memphis. John Keough did not visit the Petitioner in jail after his arrest. He stated that he has not visited the Petitioner nor followed his case.

Tom Martin, Jr., is the owner of an automotive body shop on South Third Street. He testified that the Petitioner was employed at his shop at various times in the 1970s and 1980s. He described the Petitioner as a good employee and a hard worker. Mr. Martin stated that, occasionally, he would have some problems with the Petitioner regarding his alcohol use. He described the Petitioner's alcohol use as an "on and off thing." He continued that he would usually notice the alcohol use when the Petitioner returned from lunch. Mr. Martin would notice that there would be a change in the Petitioner's actions. Mr. Martin stated that the Petitioner would be much more vocal when he was drinking and sometimes he would "just completely get out of control . . . using foul language and threatening." Mr. Martin stated that he had heard that the Petitioner had gone to prison in Mississippi in 1990.

Eleanor Raley, the Petitioner's sister, testified that she was three years older than the Petitioner. She stated that when she was growing up the family was poor and did not have electricity or running water. She stated that they were poor, but everyone else was too.

When she was nine years old, her father sold the farm and moved the family to Fayette County. Her father rented a general store from his brother. The family lived in the back of the store. She stated that, once at the store, the family's economic situation became worse. She blamed this on the fact that their father's drinking increased as the store sold beer. She explained that her father would drink the beer instead of selling the beer. She stated that her father had a problem with alcohol and sometimes would become violent after drinking. Ms. Raley stated that her brothers, Charles and the Petitioner, also had problems with alcohol. Ms. Raley stated that their father would take the Petitioner to the whiskey store and would buy the Petitioner mint gin. She estimated that the Petitioner was five or six years old. She recalled an incident where the Petitioner and the "neighbor boy" were found underneath the house drunk.

Ms. Raley stated that their mother had a hard life. In addition to putting up with threats and violence from their alcoholic father, she had to pick cotton, cook lunch and go to the fields, all without electricity or running water.

Ms. Raley testified that the Petitioner would not go to school and the truancy officer would have to come get him. She recalled that the Petitioner dropped out of school in the ninth grade. She stated that the Petitioner was married to his first wife, Barbara, for twelve to fifteen years. She added that this marriage ended due to the Petitioner's violence towards his spouse. He then married a woman named Betty. This marriage also ended in divorce. He then married another woman named Betty. This woman was the victim killed December 24, 1995. Ms. Raley stated that she had heard "through the grapevine that both of them were drinks [sic] and alcohol and fights [sic]."

Ms. Raley stated that she was never contacted by defense counsel prior to the trial. She stated that, at the time, she was living about 110 miles from Memphis. She conceded that, after her marriage in 1959, she did not maintain close contact with the Petitioner. She did visit the Petitioner on numerous occasions when he was in prison in Mississippi. However, she did not continue the relationship with the Petitioner after he was released from prison. Ms. Raley learned that the Petitioner had been arrested in Memphis. At the bequest of her sister Dorothy, Ms. Raley did visit the Petitioner while he was in jail in Memphis.

Regina Holbach, another of the Petitioner's sisters, testified that, when she was growing up, the family had no running water or electricity. She stated that they had to sleep three in the bed. She recalled their father drinking beer and moonshine. She testified that her brothers Charles and the Petitioner later developed drinking problems as well. Ms. Holbach stated that Charles' alcohol problem was pretty bad. He would get mean and want to fight. Ms. Holbrook testified at the Petitioner's 1997 trial. She stated that they did not make inquiry into the family's background.

William Gosnell, an attorney practicing in Shelby County, testified that James Ball, the Petitioner's trial counsel, suffered a major stroke two years prior to the post-conviction hearing. Prior to his stroke, Mr. Ball had a hip replacement. Mr. Gosnell reported that the stroke impaired Mr. Ball's ability to speak.

Joseph Ozment, along with James Ball, represented the Petitioner at trial and on appeal. Mr. Ozment testified that he had attended numerous courses in criminal law, including all capital case seminars in the Capital Resource Center. Regarding investigation, Mr. Ozment testified that he went to Irene's Tavern on numerous occasions. He explained that Irene, the proprietor, did not want to talk with him much. He also talked with family members during the week of the trial. Mr. Ozment explained that his file in this case was destroyed in a fire at his office.

Mr. Ozment testified that it was his understanding that they had everything that the State had given in discovery. He could not recall a hearing on pre-trial motions but was certain that one was conducted. Mr. Ozment stated that Glory Shettles, an investigator with Inquisitor, Inc., signed an affidavit stating that a mitigation investigation would take six months. Mr. Ozment stated that, in his experience since the Keough trial, a mitigation investigation could take a year or more. Mr. Ozment testified that it was necessary to gather all of the defendant's social history to have a presentation at a capital sentencing hearing. Mr. Ozment recalled that the trial court declined to appoint Inquisitor, Inc., to perform the mitigation investigation, citing the length of time involved. Additionally, the trial court refused to authorize the hourly rate requested by Inquisitor, Inc. The trial court did grant a lower hourly rate and approved the services of Brewer Detective Services. Mr. Ozment stated that the trial court's order in this case was consistent with the practice of the courts in Shelby County at the time. Mr. Ozment confirmed that they did not seek interlocutory review of the lower court's order.

Mr. Ozment testified that they did not receive the final report from the Brewer Detective Agency until after the trial. However, he stated that they were in constant contact with the Agency from the time of their appointment. He explained that the date of the final report, *i.e.*, after the trial, was not an accurate reflection of what occurred. The majority of the information gathered by the Brewer Detective Agency was received prior to trial. Included in the information gathered is an interview of Dorothy Savage, the Petitioner's sister. In this interview, Dorothy Savage related that there was an incident where the victim held a gun to the Petitioner's head. It was understood that the victim and the Petitioner had a very stormy relationship.

The Brewer Detective Agency spent thirty-five hours taking statements and locating witnesses. The total billed hours was fifty-three hours. Mr. Ozment stated that, in his

opinion, Brewer could have possibly found more witnesses had they had more time and more money.

Mr. Ozment testified that the defense theory of the case was self-defense and a lack of intent due to intoxication. He conceded that they probably did not have a tremendous amount of proof to support involuntary intoxication. He stated that they did not have an expert to testify to involuntary intoxication. Mr. Ozment agreed that the involuntary intoxication instruction requires some proof of mental disease or defect. He stated that, at some point, they discussed having the Petitioner examined by a mental health expert. He recalled consulting with Dr. Marsha Little, a psychologist, who went and spoke with the Petitioner at the jail. Dr. Little was not appointed by the trial court. Mr. Ozment did file a motion requesting that the court appoint Dr. Ciocca, a psychologist. This request was made on the third day of trial. Dr. Ciocca was appointed. Mr. Ozment testified that Dr. Ciocca's examination was for the purpose of mitigation evidence.

Mr. Ozment testified that he was aware that the Petitioner was an alcoholic. He could not recall whether he and Mr. Ball discussed the possibility of brain damage or cognitive impairments resulting from long term alcohol use. He stated that they did not request an instruction on diminished capacity.

Mr. Ozment testified that the defense also relied upon a theory of voluntary manslaughter. In support of this theory, the defense focused on the "fight, the heat of passion that occurred in the bar." He stated that their defense was not that the Petitioner was an alcoholic. Rather, part of their defense was that the Petitioner was drunk that night. Mr. Ozment conceded that the Petitioner's alcoholism was more necessary for mitigation. Mr. Ozment stated that there was a theory for the penalty phase of trial. He conceded that in establishing the Petitioner's alcoholism as a possible mitigating circumstance that it would be necessary to talk with family, friends, and employers regarding the Petitioner's drinking habits.

Mr. Ozment stated that he could not recall any specific actions completed by defense counsel which would have led to information regarding the Petitioner's alcohol abuse. He again stated that their defense was not that the Petitioner was an alcoholic. Mr. Ozment stated that, through his attendance at various seminars, he is aware that early childhood alcohol abuse can have an effect on the brain. Mr. Ozment could not recall taking steps to have the Petitioner examined for possible brain damage. He added that they had no indicators to believe that the Petitioner had any difficulties with brain function.

Mr. Ozment could not recall whether the defense team investigated the Petitioner's family's poverty. He stated that he did not believe that the defense team investigated the

-11-

Petitioner's exposure to toxic fumes in his auto body work. He stated that, due to lack of funding, he did not investigate hereditary issues involving the males in the Keough family. Mr. Ozment stated that they did not appeal the lower court's decision to limit funds.

Regarding the appeal in this matter, Mr. Ozment confirmed that five issues were raised in the Court of Criminal Appeals. One of the issues addressed the trial court's refusal to admit the Petitioner's written statement. Mr. Ozment related that the theory on appeal was that the oral statement and the written statement were collectively one statement. He stated that, if the court determined that the statements were two, "we lose." Mr. Ozment agreed that he should have filed a petition to rehear with the Court of Criminal Appeals in light of the fact that its opinion reflected that the "second statement was taken in a different room by different officers who apparently . . . were unaware what the defendant told Detective Nichols."

On cross-examination, Mr. Ozment agreed that the Petitioner's family members appeared to be more cooperative at the post-conviction proceeding. He agreed that at the time of the trial the Petitioner's family members appeared estranged from the Petitioner. Mr. Ozment stated that the defense's decision not to cross-examine Mrs. Stokes was based on his belief that Mr. Ball was "scared of this witness for some reason." He could not recall the basis of this reasoning, however. He did recall that they perceived Mrs. Stokes as a witness not favorable to the defense.

Regarding voir dire, Mr. Ozment reaffirmed that every attorney has his own personal style of voir dire. He stated that Mr. Ball was a very likable person and he was very warm with the jury, interacting with individual jurors. He agreed that an attorney's intuition about potential jurors plays an important role in voir dire. He confirmed that they used nine of their sixteen challenges. He conceded that it was fair to presume that they were satisfied with the empaneled jury since they did not use the remaining seven challenges.

Mr. Ozment stated that there was never any indicators from the Petitioner that he was suffering from alcoholism. He added that there was never any indication that the Petitioner was withholding information and/or that the Petitioner did not understand what was being explained by counsel. He stated that had he determined that the Petitioner was unable to understand him, appropriate steps would have been taken to ensure a mental evaluation of the Petitioner. Mr. Ozment testified that the Petitioner's statements to counsel during the preparation for trial coincided with the statement that the Petitioner gave to police.

Inspector Harvey Sullivan testified that in December 1995 he was a sergeant in the homicide division of the Memphis Police Department. Inspector Sullivan was the case coordinator in the Petitioner's case. He explained that position involved gathering the

paperwork and submitting it to the District Attorney General. Inspector Sullivan related that, on December 25, 1995, he arrived at work after receiving a telephone call from Sergeant Nichols. He was advised that there was a homicide and that a suspect was in custody. Inspector Sullivan discovered the Petitioner in the interview room. Sergeant Nichols advised him that the Petitioner was represented by counsel and that the Petitioner had contacted counsel. Counsel arrived and talked with the Petitioner. Counsel then talked with Inspector Sullivan and Sergeant Nichols. Inspector Sullivan informed counsel that, based upon what he was reading, it appeared that the charge would be second degree murder. Counsel informed Inspector Sullivan that, if he would charge second degree murder, then the Petitioner would give a signed statement. Inspector Sullivan reported that the District Attorney General later determined to charge first degree murder. Inspector Sullivan testified that he was not certain whether he was present for the oral statement given by the Petitioner on December 25, 1995.

Lieutenant James Nichols testified that, on December 25, 1995, he served as a detective sergeant in the homicide division of the Memphis Police Department. He explained that, on Christmas Day, only a skeleton shift would be working. Early Christmas morning, he called the homicide office and asked whether there had been any homicides the previous night. He was informed that there was a homicide. Lieutenant Nichols then proceeded to the morgue to view the body, take Polaroids of the wounds, and take fingerprints to positively identify the person. He arrived at the homicide office at 8:00 a.m., where he was informed that a person was waiting in the interview room. Lieutenant Nichols discovered the Petitioner in the interview room. Lieutenant Nichols poured the Petitioner a cup of coffee and told him it was okay to smoke a cigarette in the room. The Petitioner then informed Lieutenant Nichols that he wanted to talk to his attorney, Leslie Ballin.

Leslie Ballin arrived at the homicide office at 10:30 a.m. After meeting with the Petitioner, Leslie Ballin informed Lieutenant Nichols that the Petitioner was ready to talk to the officers. Lieutenant Nichols and Inspector Sullivan went into the interview room along with Leslie Ballin. At this time, the Petitioner was Mirandized and provided an oral statement. Lieutenant Nichols could not positively confirm that Inspector Sullivan remained in the room the entire time. He stated that Inspector Sullivan may have left the room to answer the telephone. Lieutenant Nichols stated that had Inspector Sullivan left the room and was outside of hearing range that fact would have been documented in the report.

After the oral statement concluded, Lieutenant Nichols was called to attend another matter. At this time, he turned over the interview of the Petitioner to Inspector Sullivan and O.W. Stewart.

Dr. Keith Caruso, a forensic psychiatrist, testified that he was asked to evaluate the Petitioner. He interviewed the Petitioner on May 28, 2003, June 3, 2003, and August 31, 2007. In addition to his cumulative eight hours of interviews with the Petitioner, Dr. Caruso reviewed numerous documents, including police and medical records. Dr. Caruso emphasized that the Petitioner was exposed to alcohol very early in life. In addition to alcohol use, the Petitioner suffered significant head trauma a number of times. For instance, in 1975, the Petitioner had a significant injury which required hardware being placed around the orbit of his eye. Additional head trauma occurred in 1983, 1984, 1988, and in 1994. Dr. Caruso opined that the Petitioner "suffered some brain damage and some of these insults occurred at a very early age." He noted that the Petitioner had exposure to solvents throughout his career working in auto body repair. The collective result of the exposure and the head trauma occurring before the offense resulted in brain damage.

Dr. Caruso testified that, in 1995, a referral for psychiatric care of the Petitioner was made. He stated that the Petitioner was ultimately diagnosed with major depression. Dr. Caruso reflected that both the Petitioner and Betty Keough were both receiving psychiatric treatment in 1995.

Dr. Caruso consulted with other experts before arriving at his diagnosis of the Petitioner. He spoke with Daniel Grant, a psychologist, Murray Smith, a substance abuse specialist, and Robert Kessler, a neuroradiologist. Dr. Caruso related that the results of the Petitioner's PET scan had some abnormal findings. A CT scan of his head showed some "mild diffused corticotroph," which are cells of the anterior lobe of the pituitary gland. The PET scan showed decreased brain function in the frontal lobes of the brain. Dr. Caruso testified that the Petitioner's frontal lobes are not functioning.

Dr. Caruso opined that "one of the diagnosis is a severe mental disease, major depression, another is severe mental defect, and that's dementia due to multiple ideologies or multiple causes which would be multiple closed head trauma, chronic alcoholism, and exposure to solvents." Dr. Caruso added that the Petitioner was alcohol dependent and, at the time of the offense, was intoxicated on alcohol. The Petitioner had a history of abusing other substances, including benzodiazepines, pain medications, and tranquilizers. Dr. Caruso concluded that the Petitioner satisfied criteria for poly substance abuse. Dr. Caruso added that the Petitioner met the criteria for anti-social personality disorder with borderline traits.

Dr. Caruso opined that the causes of the Petitioner's brain damage were multiple. He delineated chronic exposure to alcoholism that dated to the age of five or six years, multiple closed head traumas, and exposure to organic solvents. Regarding his diagnosis of alcohol dependence, Dr. Caruso stated that several witnesses verified the Petitioner's drinking and, in 1994, the Petitioner had surgery for a bleeding ulcer. The Petitioner reported that he

suffered from "the shakes" and other withdrawal symptoms if he did not maintain his drinking. Dr. Caruso also reflected upon the domestic violence modeling prevalent in the Petitioner's family. That is, he explained, if you live in a home in which women are treated badly, you are at a higher risk for treating women badly and for domestic violence as you get older.

Regarding the homicide, Dr. Caruso reflected that, at the time, the Petitioner suffered from a "severe mental defect, the dementia due to the multiple ideologies, the head trauma, the chronic alcoholism and the solvent exposure." These defects impacted the Petitioner's ability to process information and inhibited his ability to maintain his emotions. The Petitioner's intoxication exaggerated the other symptoms. Dr. Caruso opined that the Petitioner "was in a state of a great deal of passion and excitement at the time of the alleged offense." He added that the Petitioner had damage to his brain in the area that controls impulse control. Dr. Caruso stated that the Petitioner had "diminished impulse control."

Lisse Wendt testified at the Petitioner's 1997 trial. Ms. Wendt was present at Irene's Bar on the night of the homicide. Ms. Wendt observed the owner of the bar approach the victim and the Petitioner and ask them to leave the bar. Ms. Wendt also observed Betty Keough shove the Petitioner. She conceded that she may not have had a clear view of the incident.

Mary Stokes Kelly also testified at the Petitioner's 1997 trial. Ms. Kelly is the daughter of Ms. Stephenson, the Petitioner's "on again, off again" girlfriend. Ms. Kelly explained that the Petitioner had spent the evening of December 23, 1995, at her home. She testified that the Petitioner's trial counsel did not contact her prior to the trial. Regarding her relationship with the Petitioner, Ms. Kelly stated that he "raised her for probably a period of five years," and she had known him for about thirty years. She testified that the Petitioner was a "[v]ery frequent" drinker.

Ms. Kelly related that, on the morning of December 24, 1995, the Petitioner, upon arising, asked her for a beer. Ms. Kelly informed him that she did not have beer but that she had vodka and rum. The Petitioner asked her for the vodka. She stated that the Petitioner first drank a six-ounce glass of vodka and then approximately three more ounces of vodka. The Petitioner then filled a flask with vodka, which he continued to drink out of during the day. The Petitioner later purchased at least two large cans of beer, which he drank. When the group returned to Ms. Kelly's home, the Petitioner received telephone calls from Bobby Holley. The Petitioner then left. At the time of the Petitioner's departure, Ms. Kelly reported that less than three-quarters of the vodka was left. When the Petitioner later returned to her home, he finished the bottle of vodka and drank half of the half-gallon bottle of rum.

-15-

Dr. Daniel Grant, a neuropsychologist, testified that, in February 2005, he met with the Petitioner on two occasions in order to perform a neuropsychological assessment. Dr. Grant consulted with Dr. Caruso, a psychiatrist, and Dr. Smith, an addictionologist. Dr. Grant also had access to the report of Dr. Kessler. Dr. Grant concluded that the Petitioner suffered from "dementia due to multiple ideologies," resulting from " a number of head injuries. . . ." He added that the dementia could be "due to the head trauma, due to substance abuse which would have been the alcohol, and also solvent exposure through the use of working with the paints and chemicals in the body shop and also then major depression which was recurring."

Dr. Grant testified that the Petitioner's general level of functioning was 55. He explained that the average person is functioning at 75 or higher. Dr. Grant confirmed that the Petitioner completed an eight-week alcohol and drug program while incarcerated in Mississippi.

Dr. Murray Smith, a certified specialist in addiction medicine, testified that he was retained by post-conviction counsel to evaluate the Petitioner. Dr. Smith met with the Petitioner on two occasions, once in September 2006, and again early September 2007. He testified that, as a result of these interviews, he learned that the Petitioner's life has been severely and drastically impacted by his use of alcohol. Dr. Smith stated that alcoholism is genetic. In this regard, it was important to have an understanding of the Petitioner's family history of alcoholism. The Petitioner's older brother Charles was "a very severe alcoholic," who suffered from rage episodes. Dr. Smith also related that the Petitioner's father was clearly an alcoholic. The Petitioner's father had temper episodes to a lesser extent than the Petitioner and Charles. In addition to the hereditary aspects of alcoholism, there is also the psychosocial and environmental issues that impact the use of alcohol. Environmentally, the Petitioner was exposed to alcohol very early in life and by the age of sixteen, was drinking on a daily basis. Dr. Smith stated that alcoholism is a progressive illness, *i.e.*, it worsens as time goes on.

Dr. Smith learned that the Petitioner worked regularly throughout his life in the auto body repair industry. In this line of work, the Petitioner was routinely exposed to solvents. Dr. Smith related the Petitioner's exposure to "huffing," or inhaling things. He stated that the solvents used in auto body repair had a similar impact on the brain as alcohol with the exception that they tend to cause more brain damage. Dr. Smith testified that the Petitioner reported drinking a fifth of Old Charter on a daily basis. Dr. Smith also stated that the Petitioner suffered from multiple head injuries. Dr. Smith related that the Petitioner had "episodes of rage that started when he was a teenager." This was especially volatile when accompanied with alcoholism. He stated that episodes of violence are not uncommon when combined with the use of alcohol.

-16-

Dr. Smith opined that the Petitioner "is a chronic alcoholic who also has evidence of brain damage, most likely related to multiple factorial causes which included closed head trauma, the exposure to the solvents and the chronic alcoholism." In reaching his diagnosis, Dr. Smith related three factors that comprise addiction: (1) preoccupation with alcohol, (2) loss of control or compulsive use of alcohol, and (3) continuing use even when presented with problems. He stated that the Petitioner's history satisfies these three criteria for addiction. Dr. Smith confirmed that the Petitioner had been diagnosed by other professionals as suffering from dementia, cognitive deficits, and frontal lobe brain dysfunction. Dr. Smith testified that when you add alcoholism to these impairments, the deficits or dysfunction is magnified. As to the night of the offenses, Dr. Smith stated that the Petitioner was intoxicated and he was in a rage. The Petitioner's rage took over and he became impulsive which is multi-factorial from both the alcohol and the brain injuries. Dr. Smith stated that "[i]mpulsivity is the opposite of reflectivity." The Petitioner's "[i]mpulsivity was accentuated by the alcohol. Dr. Smith testified that "rage is not premeditated." He stated that the Petitioner did not choose to go into a rage on that night.

Dr. Smith testified that, since the Petitioner's incarceration, there have been no incidents of inappropriate or rageful behavior. He concluded that this was based on the combination of things including the fact that the disinhibitory effect of alcohol has not been present.

Dr. Ciocca testified that he could not recall ever performing an evaluation of the Petitioner.

James Robert Carter, Jr., was the lead prosecutor in Petitioner's case in the trial court. Mr. Carter stated that he was not involved in the decision to file the death notice in this case. He stated that a plea offer was made in this case, but that was not unusual. Mr. Carter agreed that the decision of whether a sentence of death was appropriate in any given case was ultimately the decision of the jury. He stated that there is no ban to the offer or acceptance of a plea after the death notice was filed.

Judge Leonard T. Lafferty presided over the Petitioner's 1997 trial in the Shelby County Criminal Court. Judge Lafferty testified that, in selecting James Ball and Joseph Ozment to replace the Public Defender's Office in representing the Petitioner, he had confidence in James Ball's abilities and that Mr. Ball had an extraordinarily good knowledge of the law as well as a great rapport with juries. He related that, in his opinion, Mr. Ball and Mr. Ozment appeared prepared for the case, both at the guilt and penalty phase.

Judge Lafferty testified that the aggravating circumstance relied upon by the State in support of the imposition of the death penalty was the fact that the Petitioner had been

previously convicted of a felony whose elements involved violence to a person. He confirmed that this factor is generally a more significant aggravator. Judge Lafferty stated that, because of the facts of this case, he charged second degree murder and voluntary manslaughter. He also charged self-defense.

Regarding expert services in this case, Judge Lafferty conceded that the request for mitigation services submitted twelve days prior to trial was "calling it close." Judge Lafferty also recognized that when an attorney was asking for an instruction on intoxication it was logical to presume some evidence of alcoholism. He stated that, in his opinion, had James Ball known about the Petitioner's alcoholism, he would have requested an expert in mental health to prepare this issue.

## Standard of Review

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A §. 40-30-103. The petition challenging Petitioner Keough's convictions is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. See T.C.A. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, the findings of fact are reviewed under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citations omitted). In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance

-18-

with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). Id. at 456.

## I. Denial of Right to Full and Fair Post-Conviction Evidentiary Proceeding

Due process in the post-conviction setting requires that the defendant have "the opportunity to be heard at a meaningful time and in a meaningful manner." Stokes v. State, 146 S.W.3d 56, 61 (Tenn. 2004). The Petitioner asserts that he was denied a full and fair post-conviction evidentiary proceeding in that the trial court denied the Petitioner's motion for limited cross-examination.

The Petitioner filed a motion for a declaration that he retain his right against self-incrimination and to permit him to testify regarding his relationship with trial counsel and the circumstances of a plea offer without subjecting himself to cross-examination on the circumstances of the offense. The post-conviction court found that, although the Petitioner retained a right not to testify, if he did testify regarding any post-conviction claim he would waive that right and would be subject to cross-examination on any issue by the State. Counsel for the Petitioner then entered a proffer of the evidence to which the Petitioner would testify if he had been permitted to testify without being cross-examined on the facts and circumstances of the offense. The proffer included the following information:

The Petitioner and trial counsel never discussed the facts of the case.

Counselor Ball visited the Petitioner at least once in jail, during which Mr. Ball discussed religion and not the Petitioner's case.

The Petitioner asked Mr. Ball whether he could get a plea offer. Mr. Ball responded that he would have to wait for the State to voluntarily make the offer.

The Petitioner met with Counselor Ozment twice, during which time they never discussed the facts of his case.

The Petitioner asked Counselor Ball to subpoena certain witnesses. Mr. Ball responded that they were not able to subpoena these witnesses.

The Petitioner did not see a psychologist or psychiatrist prior to trial.

The first plea offer was made during voir dire. This offer was for twenty-five years to second degree murder. No further offers were made.

The Petitioner asked Mr. Carter if he could work with him a little bit. Mr. Carter said no because he could get at least twenty-five years.

A witness may be cross-examined on any matter relevant to any issue in the case. See Tenn. R. Evid. 611(b). At trial, the scope of cross-examination of a criminal defendant is defined by Rule 611(b), which permits cross-examination on any relevant subject. Tenn. R. Evid. 611(b). The propriety, scope, manner, and control of cross-examination of witnesses rests within the sound discretion of the trial court. State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citations omitted). The Petitioner seeks to limit the scope of his cross-examination with disregard to the court's discretion and/or the Rules of Evidence. In support of his request, the Petitioner cloaks himself within the protections of the Fifth Amendment.

The Fifth Amendment, by its terms, prevents a person from being "compelled in any criminal case to be a witness against himself." U.S. Const., Amendment V. An individual's privilege against self-incrimination is rooted in our society's "traditional respect for the individual." Maness v. Meyers, 419 U.S. 449, 461, 95 S. Ct. 584, 592 (1975). The privilege ensures the continued vitality of our accusatory system of justice. See United States v. Rivas-Macias, 537 F.3d 1271, 1277 (10th Cir. 2008) cert. denied, – U.S. –, 129 S. Ct. 1371 (2009).

In order for the privilege to apply, the individual must face "some authentic danger" of self-incrimination. Id. at 1277 (citing United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997); see also Zicarelli v. New Jersey State Comm'n of Investigation, 406 U.S. 472, 478, 92 S. Ct. 1670, 1675 (1972); Ullman v. United States, 350 U.S. 422, 439, 76 S. Ct. 497, 507 (1956)). When no further danger of incrimination is present, the privilege ceases to apply. In Mitchell v. United States, 526 U.S. 314, 119 S. Ct. 1307 (1999), the United States Supreme Court determined, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. Id. at 326, 119 S. Ct. at 1314. If no adverse consequences can be visited upon the convicted person by reason of further testimony then there is no further incrimination to be feared. Id. In the present case, the Petitioner asserts that, because "[t]he purpose of a post-conviction proceeding is to provide a remedy for those individuals who have been unconstitutionally deprived of a fair trial;" i.e., a new trial, "there is certainly a possibility that the Petitioner's testimony could be used against him." The State asserts that there is no basis for the assertion of the privilege where the sentence has been fixed and the judgment of conviction has become final.

In Nichols v. State, the State called Nichols to testify at the post-conviction evidentiary hearing. Nichols invoked his constitutional right against self-incrimination and refused to answer questions. Nichols, 90 S.W.3d at 586. Nichols was permitted to assert

his right against self-incrimination by the trial court and did not answer any of the questions asked by the prosecutor about the offenses and the post-conviction allegations. Although not raised as an issue on direct appeal, a panel of this Court concluded that Nichols should not have been permitted to invoke his right against self-incrimination in the post-conviction proceedings. Nichols, 90 S.W.3d at 586. Specifically, the panel determined that there is no right against self-incrimination in a post-conviction case because Nichols had already been convicted of the offenses being challenged. The Tennessee Supreme Court, however, agreed with both parties that the Court of Criminal Appeals erred in addressing this issue. Id. at 607 (citing Tenn. R. App. P. 13(b)). The state's highest court determined that to review and reach a decision of whether a right against self-incrimination applies in post-conviction cases under the facts and circumstances of the case would amount to an advisory opinion and declined to review the issue. Id. Accordingly, this Court is presented anew with the determination of whether the privilege against self-incrimination applies in a post-conviction proceeding.

Relief under the statutorily-created post-conviction procedure is limited to constitutional errors rendering the conviction or sentence void or voidable. See T.C.A. § 40-30-103. Relief in such cases is generally a new trial or a new sentencing hearing. It is generally recognized that, even after conviction, a defendant who shows a "real and appreciable risk" of subsequent conviction may be entitled to assert the privilege against self-incrimination with regard to the crime. 1 John William Strong et. al., McCormick on Evidence §§ 121, 122 (4th ed. 1992); see also Taylor v. Best, 746 F.2d 220, 222-24 (4th Cir. 1984). What constitutes incriminating evidence not only consists of answers that would in themselves support a conviction, but also information that would "furnish a link in the chain of evidence that could lead to prosecution." Maness, 419 U.S. at 461, 95 S. Ct. 584.

"[T]he availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." Estelle v. Smith, 451 U.S. 454, 462, 101 S. Ct. 1866, 1873 (1981) (quoting Application of Gault, 387 U.S. 1, 49, 87 S. Ct. 1428, 1455 (1967)). "To sustain the privilege, it need only be evident from the implications of the question in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Martin v. Flanagan, 789 A.2d 979, 984 (Conn. 2002) (quoting Hoffman v. United States, 341 U.S. 479, 486-87, 71 S. Ct. 814 (1951)). In a post-conviction setting where there exists a real possibility of a new trial, the privilege against self-incrimination remains.

Our inquiry, however, does not end here. The Petitioner seeks to assert the privilege to secure a limited right of cross-examination by the prosecution. In support of his position, the Petitioner relies upon State v. Cazes, 875 S.W.2d 253, 264 (Tenn. 1994). In Cazes, defense counsel moved, prior to the start of the penalty phase of a capital trial, that the State

be prohibited from cross-examining the defendant during the sentencing hearing with regard to the circumstances of the offense. The trial court denied the motion, agreeing with the State that cross-examination should be permitted on all matters relevant to sentencing, including the circumstances of the offense. Cazes, 875 S.W.2d at 264.

On appeal, the State conceded that the lower court erred by denying Cazes' motion. Our supreme court recognized that the Eighth Amendment to the United States Constitution "requires States to allow consideration of mitigating evidence in capital cases." Id. at 266 (citing McKoy v. North Carolina, 494 U.S. 433, 442, 110 S. Ct. 1227, 1233 (1990) (emphasis in original); see also Boyde v. California, 494 U.S. 370, 377-78, 110 S. Ct. 1190, 1196 (1990)). The court noted that there is a serious risk that the death penalty would be imposed erroneously should the sentencer fail to consider all of the mitigating evidence. Cazes, 875 S.W.2d at 266 (citations omitted). Our supreme court, acknowledging the interplay between the Fifth and Eighth Amendment implications raised in a decision whether to permit only limited cross-examination of a defendant at a capital sentencing hearing, determined that "only in the limited sphere of a death penalty sentencing hearing, a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does not operate as a complete waiver of the privilege against self-incrimination." Id. at 266. Accordingly, the Tennessee Supreme Court held that a defendant has a right to limited cross-examination if he or she wishes to testify about only collateral mitigating circumstances at the penalty phase of a capital trial. Id. Notwithstanding this limited waiver, the court noted that the defendant may nonetheless be completely and thoroughly cross-examined about all testimony given or fairly raised by the defendant on direct examination. Id.

Upon consideration of the applicable principles of law and with consideration of the differences in the nature and circumstances of a capital sentencing proceeding compared to a capital post-conviction proceeding, we decline the opportunity to extend the Cazes limited cross-examination rule to capital post-conviction proceedings. The competing interests of the Fifth and Eighth Amendments are not necessarily present in a post-conviction proceeding. Similarly, evidence which is constitutionally guaranteed to be admissible evidence in a capital sentencing hearing is not afforded that same guarantee in a capital post-conviction proceeding. Accordingly, we recognize and reiterate the long-standing principle that "[a] defendant who chooses to testify waives his privilege against self-incrimination with regard to the testimony he gives." Harrison v. United States, 392 U.S. 219, 222, 88 S. Ct. 2008, 2010 (1968). A defendant who elects to testify on direct examination at his/her post-conviction hearing is bound to answer questions on cross-examination. State v. Stapleton, 638 S.W.2d 850, 855 (Tenn. Crim. App. 1982); see also Rogers v. United States, 340 U.S. 367, 71 S. Ct. 438 (1951). In other words, the privilege is waived for matters to which the witness testifies. The waiver's scope is determined by the scope of the relevant cross-

examination. <u>Mitchell</u>, 526 U.S. at 314, 119 S. Ct. at 1308; <u>Brown v. United States,</u> 356 U.S. 148, 154, 78 S. Ct. 622, 626 (1958);

In the present case, the Petitioner seeks to choose his testimony and deny the prosecution the right to question him about these statements. A witness may not testify voluntarily about a subject and then assert the privilege against self-incrimination when questioned about the details. <u>Rogers</u>, 340 U.S. at 373, 71 S. Ct. at 442. No unfairness enures to a defendant's detriment by our ruling. It is the defendant who determines the area of disclosure and therefore of inquiry. <u>Brown</u>, at 155, 78 S. Ct. at 622. To permit a witness to selectively pick and choose what aspects of a particular subject to discuss would cast serious doubt on the trustworthiness of the statements and would diminish the integrity of the factual inquiry. <u>Mitchell</u>, 526 U.S. at 322, 119 S. Ct. at 1312.

For the reasons heretofore stated, we cannot conclude that the trial court erred by refusing to grant the Petitioner a limited right of cross-examination in a capital post-conviction proceeding. The Petitioner was able to claim the privilege or elect to testify. The Petitioner made a knowing decision to assert the privilege. The Petitioner is not entitled to relief on this issue.

## II. Ineffective Assistance of Counsel

### A. Standard of Review

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." <u>Gideon v. Wainwright</u>, 372 U.S. 335, 350, 83 S. Ct. 792, 800 (1963) (quoting <u>Betts v. Brady</u>, 316 U.S. 455, 465, 62 S. Ct. 1252, 1257 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716 (1980); <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n. 14, 90 S. Ct. 1441, 1449 (1970); <u>see also</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Strickland</u>, 466 U.S. at 686, 104 S. Ct. at 2064; <u>Combs v. Coyle</u>, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; see also Combs, 205 F.3d at 277.

The performance prong of the Strickland test requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness, or "outside the range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066; see also Kimmelman v. Morrison, 477 U.S. 365, 386, 106 S. Ct. 2574, 2588 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Combs, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, it is acknowledged that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987). Notwithstanding, it is the duty of this Court to "search for constitutional [deficiencies] with painstaking care" as this responsibility is "never more exacting than it is in a capital case." Id. at 785, 107 S. Ct. at 3121.

## B. Guilt Phase Deficiencies

The Petitioner claims that trial counsel, James Ball and Joseph Ozment, failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, Petitioner asserts that counsel denied him effective representation by breaching acceptable standards for capital representation at the guilt phase in that:

1.  Trial counsel failed to adequately investigate the circumstances of the crimes and the Petitioner's background.

2.  Trial counsel failed to request expert services within a reasonable time.

3.  Trial counsel failed to effectively question and cross-examine witnesses to support the theory of the defense.

4.  Trial counsel failed to investigate the Petitioner's mental, physical, or psychological condition to establish that the Petitioner was unable to premeditate the offense.

5.  Trial counsel failed to properly select a jury and request appropriate jury instructions.

6.  Trial counsel failed to correct implications of the State's proof that Lieutenant Nichols was alone at the time of the oral statement.

**1.  Failure to adequately investigate the circumstances of the crimes and the Petitioner's background, including the Petitioner's mental, physical, and psychological condition.**

The Petitioner contends that trial counsel's failure to adequately investigate the circumstances of the offense and his background resulted in a trial absent constitutional guarantees of fairness and reliability in the verdict. The Petitioner asserts that the duty to properly investigate was well-established prior to the Petitioner's 1997 trial. He asserts that trial counsel's deficient performance requires reversal of his convictions and sentences because counsel's numerous errors undermine confidence in the outcome. The Petitioner contends that trial counsel's failures denied the jury information about the Petitioner's mental, physical, and psychological condition that was critical to a fair determination of the Petitioner's degree of guilt and sentence. He asserts that had the jury been privy to the information that counsel failed to discover there is a reasonable probability that the outcome would have been different.

**a.  Petitioner's Alcoholism**

Petitioner asserts that trial counsel was aware that he had a drinking problem. He contends that, despite having this information, trial counsel was deficient for failing to investigate further into the Petitioner's addiction. He contends that had counsel done so, counsel would have been able to make a convincing argument to the jury that the Petitioner

was unable to premeditate the offenses. He adds that, with appropriate expert testimony, trial counsel could have requested and received an instruction that due to a mental disease or defect, the Petitioner was unable to form the requisite culpable mental state.

At the post-conviction evidentiary hearing, the following proof was presented regarding the Petitioner's addiction to alcohol. The Petitioner was first exposed to alcohol at age five or six. By the age of sixteen, the Petitioner was drinking on a daily basis. The Petitioner's father and older brother Charles were both alcoholics. The Petitioner and his brother Charles suffered from rage episodes which were magnified by the use of alcohol. Their father also was predisposed to such episodes but to a lesser degree. The rage episodes were impulsive and cannot be premeditated. Alcoholism is genetic and is a progressive disorder. An addictionologist, Dr. Smith, diagnosed the Petitioner as satisfying the criteria for being an alcoholic. The Petitioner, as an alcoholic, had the need to introduce the chemical into his body or he would suffer withdrawal symptoms. This expert testimony was consistent with lay witness observations that the Petitioner could drink large amounts of alcohol and still appear calm. The Petitioner had surgery for a bleeding ulcer which was related to his alcoholism. Alcoholism will magnify other mental deficits.

## b. Evidence of other mental deficits and defects

At the post-conviction evidentiary hearing, evidence was presented to establish that, not only did the Petitioner suffer from the effects of alcoholism, but also that the Petitioner had suffered from numerous head traumas during his lifetime. Dr. Caruso testified that the Petitioner suffered some brain damage as a result of these injuries. Additionally, by the very nature of his profession in the auto body repair industry, the Petitioner was routinely exposed to solvents. The combination of the head injuries, the exposure to industrial solvents, and his alcoholism resulted in impairments to his brain function.

In 1995, the Petitioner was diagnosed with major depression. The Petitioner's frontal lobes of the brain also are not functioning. Additionally, Dr. Caruso testified that the impact of domestic violence modeling was prevalent in the Petitioner's family. In other words, there was a higher likelihood that the Petitioner would treat women badly if he was exposed to domestic violence during his formative years. There was evidence that the Petitioner's mother was abused by his father. Dr. Caruso determined that the Petitioner suffered from a "severe mental defect, the dementia due to the multiple ideologies, the head trauma, the chronic alcoholism and the solvent exposure." He opined that these defects impacted the Petitioner's ability to process information and inhibited his ability to maintain his emotions. Dr. Caruso stated that the Petitioner had "diminished impulse control" and, at the time of the offense, "was in a state of a great deal of passion and excitement."

Dr. Grant corroborated Dr. Caruso's diagnoses. He concluded that the Petitioner suffered from "dementia due to multiple ideologies," resulting from "a number of head injuries. . . ." He explained that the dementia could be from the head trauma, substance abuse, and solvent exposure.

### c. Post-Conviction Court's Findings

The post-conviction court acknowledged the testimony of the experts presented at the evidentiary hearing. Notwithstanding, the post-conviction court declined to find prejudice resulting from the failure to investigate the Petitioner's mental condition. Specifically regarding the experts' diagnosis as to the Petitioner's ability to form the requisite mental state, the post-conviction recognized that Dr. Caruso acknowledged that the Petitioner was composed enough and had enough cognition to calmly wait for police; contact his attorney prior to their arrival; and preliminarily negotiate with law enforcement officers a potentially lesser charge in exchange for his statement. The post-conviction court further determined that the decision not to present a theory of diminished capacity to the jury was a tactical decision. The post-conviction court also recognized that it was within sound trial strategy of the defense not to present the Petitioner as a "drunk."

### d. Analysis of Alleged Failure to Investigate

The proper standard for attorney performance is that of "reasonably effective assistance," or, in other words, the Petitioner must show that trial counsel's performance fell below an objective standard of reasonableness considering all the circumstances. Strickland, 466 U.S. at 687-88, 104 S. Ct. 2052. Counsel's reasonableness must be assessed on the facts of the particular case, viewed as of the time of counsel's conduct. Id. at 689, 104 S. Ct. 2052. In the context of ineffective assistance based on counsel's failure to investigate, the court must determine whether counsel exercised "reasonable professional judgment." Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S. Ct. 2527, 2535 (2003).

The Petitioner alleges that had counsel investigated his history of chronic alcoholism and his mental defects counsel would have been able to present a strong case negating the requisite intent for the offense of first degree murder, *i.e.*, premeditation. Trial counsel was aware that the Petitioner was intoxicated on the night of the offense and part of their defense was that the Petitioner's intoxication impaired his capacity to form intent. During closing argument, Mr. Ball focused on the fact that both Betty Keough and the Petitioner were drinking prior to the offense. The trial court instructed the jury as to the defense of intoxication.

It is unclear whether the defense team believed the Petitioner to be an alcoholic. It appears that a rudimentary investigation would have revealed the Petitioner's 1994 surgery for a bleeding ulcer, the Petitioner's completion of alcohol and drug counseling when in prison in Mississippi, and the predisposition of his family for alcoholism which would have triggered the need for further investigation as to the severity of the Petitioner's alcohol use. However, it is just as likely that family members would have remained silent and would not have revealed facts about their personal life, especially when such facts suffer a social stigma. Regardless, the fact that Petitioner was an alcoholic or was merely just intoxicated on the date of the offense does little, under the law, to change the result in the present case. The jury heard testimony that the Petitioner was intoxicated or had imbibed alcohol on the night in question. The jury was provided an instruction on voluntary intoxication. The jury was able to consider the Petitioner's state of intoxication in as much as the intoxication would negate the culpable mental state. Clearly, by their verdict, the jury rejected a defense of voluntary intoxication.

Involuntary intoxication absolves one of criminal responsibility due to his or her intoxicated condition. See Advisory Comm'n Comments, T.C.A. § 39-11-504. Involuntary intoxication means intoxication that is not voluntary. See T.C.A. § 39-11-503(d)(2). Voluntary intoxication means intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known. See T.C.A. § 39-11-503(d)(3). Involuntary intoxication is a very rare thing, and can never exist where the person intoxicated knows what he or she is drinking, and drinks the intoxicant voluntarily, and without being made to do so by force or coercion. 2 Crim. Prac. Manual §40:2 (citing State v. Highsmith, 619 S.E.2d 586 (N.C. Ct. App. 2005)). Intoxication is voluntary so long as the accused has exercised independent judgment or volition when taking the intoxicant, regardless of a physiological "need." 2 Crim. Prac. Manual §40:2 (citing Watson v. State, 654 S.W.2d 730 (Tex. App. 1983)). It is generally recognized that chronic alcoholism cannot as a matter of law be used to establish involuntary intoxication. See, e.g., Hernandez v. Johnson, 213 F.3d 243, 249-50 (5th Cir. 2000), cert. denied, 531 U.S. 966, 121 S. Ct. 400 (2000); Miller v. State, 439 So.2d 800 (Ala. Crim. App. 1983); Evans v. State, 645 P.2d 155 ( Alaska 1982) See v. State, 757 S.W.2d 947 (Ark. 1988); Ford v. State, 298 S.E.2d 327 (Ga. Ct. App. 1982); Polk v. State, 567 A.2d 1290, 1292 (Del.1989); State v. Burroughs, 729 S.W.2d 571 (Mo. Ct. App. 1987); Commonwealth v. Plank, 478 A.2d 872 (Pa. Super. Ct. 1984); Heard v. State, 887 S.W.2d 94, 98 (Tex. App.1994); Loveday v. State, 247 N.W.2d 116, 121-22 (Wis. 1976). The Petitioner has failed to establish that had the jury had testimony relating to the Petitioner's "chronic alcoholism" the jury would not have found him guilty of premeditated murder. He is not entitled to relief on this ground.

The Petitioner also contends that had trial counsel discovered and investigated evidence of his mental deficits, this would have supported a defense of "diminished capacity," and would have prevented the jury from concluding that the Petitioner had the requisite *mens rea* to support a conviction for premeditated first degree murder. At the post-conviction evidentiary hearing, the Petitioner introduced the testimony of three experts to establish that the Petitioner suffered from depression, dementia and diminished impulse control. The experts agreed that these multiple defects were likely the result of head trauma, chronic alcoholism and solvent exposure. Hindsight is "twenty-twenty." That maxim is absolutely applicable to the present case. We will not measure the level of an attorney's investigation at the trial level against what has been revealed after an extensive and exhaustive search for errors and additional evidence conducted over a period of almost five years. A trial attorney is in a unique position. He must weigh the need to investigate and the areas to investigate under the time and financial constraints imposed by the trial court. We are unable to conclude that trial counsel rendered deficient performance by not marshaling evidence which took post-conviction counsel several years to develop.

In the present case, the record is silent to and the Petitioner identifies no evidence of a cognitive impairment which would have triggered trial counsel's duty to further investigate the Petitioner's mental and psychological condition. In assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538. Due to a debilitating stroke, Mr. Ball was unable to testify at the post-conviction hearing. Mr. Ozment testified that his case file on this matter was destroyed in a fire. Moreover, ten years had elapsed between the trial and the post-conviction evidentiary hearing. Mr. Ozment did, however, recall that there were no indicators to counsel that the Petitioner had any difficulties with brain function. He added that there were no indicators to counsel that the Petitioner was withholding information. Finally, Mr. Ozment stated that there were no indicators that the Petitioner was unable to understand what was being explained by counsel. Accordingly, we cannot conclude that trial counsel was deficient in failing to investigate the Petitioner's mental condition. The Petitioner is not entitled to relief on this issue.

**2. Failure to request expert services in a reasonable time**.

Trial counsel was appointed eight months before the Petitioner's trial. Seventeen days prior to trial, counsel requested the services of an investigator and a mitigation specialist. Affidavits submitted with the request estimated that the mitigation investigation would take six months. The trial court denied the motion in part because of the time involved and the hourly rate. The trial court did approve seventy-five hours for an investigator at a reduced hourly rate. Trial counsel retained the services of Brewer Detective Service but did not

receive a final report until the conclusion of trial. During voir dire, trial counsel requested the services of a psychologist to evaluate the Petitioner. Trial counsel intended for the psychologist to evaluate the Petitioner for mitigation purposes but did not consider retaining an expert for the guilt phase. The Petitioner complains that trial counsel's requests for expert services were made too late.

Claims of ineffective assistance of counsel can be based upon trial counsel's failure to engage the services of an expert witness. Cf., Nields v. Bradshaw, 482 F.3d 442, 456 (6th Cir. 2007), cert denied, 552 U.S. 1118, 128 S. Ct. 919 (2008). To succeed on such a claim, the petitioner must show that it is reasonably probable that the results of the proceedings would have been different. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. At the post-conviction hearing, Mr. Ozment testified that the factual investigation of the case was relatively uncomplicated. He stated that the factual investigation of the offense was largely completed prior to their request for funding. Accordingly, their request for expert services was primarily for the preparation of mitigation. Mr. Ozment testified that the defense team requested the services of Dr. Ciocca to evaluate the Petitioner for possible mitigation evidence. Dr. Ciocca testified that he never evaluated the Petitioner. Mr. Ozment stated that, although he did not receive the final report from the Brewer Detective Agency until after trial, he did state that the defense team was in constant contact with the Agency from the time of their appointment. He stated that the majority of the information gathered by the Brewer Detective Agency was received prior to trial. Additionally, Judge Lafferty testified at the post-conviction hearing that the Petitioner was initially represented by the public defender. The Shelby County Public Defender's Office had its own investigator and social worker. Judge Lafferty explained that for the first six months the Petitioner had the benefit of these services. We cannot conclude that the Petitioner has established prejudice resulting from the alleged untimeliness of counsel's request for expert services. The Petitioner is not entitled to relief on this ground.

**3. Failure to effectively question and cross-examine witnesses to support the theory of the defense.**

The defense theory at trial was a combination of self-defense and the inability to form intent due to intoxication. An important element in establishing this defense was to establish how much the Petitioner drank on the day of the offense. The Petitioner contends that trial counsel's cross-examination of witnesses Lisse Wendt, Bobby Holley, and Mary Stokes Kelly was deficient. Specifically, he alleges that each of these witnesses could have verified the amount of alcohol consumed on the date of the offense. Counsel failed to elicit this information from the witnesses. In support of his claim, the Petitioner asserts that, at trial, the only evidence that the Petitioner was drinking on the day of the offenses came from Kevin Berry, one of the victims and a witness for the State. Mr. Berry testified that he had

seen the Petitioner earlier in the day and said that the Petitioner had a drink in his hand. Mr. Berry further related observing the Petitioner with a bottle of "Old Charter." Mr. Berry stated that if the Petitioner was not drunk at Irene's, he was "well on his way" and described the Petitioner as "pretty well lit" at the time of the offenses.

The Petitioner asserts that had trial counsel effectively questioned Bobby Holley, Lisse Wendt, and Mary Stokes Kelly, he could have established that he was intoxicated on the date of the offense. He maintains that Bobby Holley and Mary Stokes Kelly were aware of the Petitioner's drinking habits and could have verified that the Petitioner is the kind of person who can drink but not appear drunk. Mary Stokes Kelly could have testified as to the large quantity of alcohol ingested by the Petitioner on the date of the offense. Finally, he asserts that while Lisse Wendt testified that Betty Keough shoved the Petitioner when they were walking out of the bar, she was not questioned about seeing Betty Keough shoving the Petitioner when they were asked to leave the bar nor was she asked regarding what she overheard Betty Keough tell the Petitioner. The Petitioner asserts that had this information been elicited the Petitioner's theory of defense would have been supported, *i.e.*, that due to mental impairments aggravated by alcohol the Petitioner was unable to premeditate the offenses.

At the post-conviction hearing, Mr. Ozment testified that Mr. Ball perceived Mary Stokes Kelly as a hostile witness. Mary Stokes Kelly was the daughter of a woman with whom the Petitioner had a long-standing romantic involvement. This relationship continued even during periods when the Petitioner was married. Her testimony along with the testimony of Bobby Holley was effectively that the Petitioner usually drank a lot and did not exhibit outward signs of intoxication. It was within the realm of discretion of defense counsel to ascertain whether such testimony would be consistent with their theory that the Petitioner was so intoxicated as to be unable to form the requisite intent for premeditation. Regarding the alleged deficiencies to the questioning of Lisse Wendt, we are uncertain as to the import of the omissions in her testimony. The jury was already privy to information that the marriage of the Petitioner and Betty Keough was a stormy one. The jury was already privy to information that Betty Keough had shoved the Petitioner on the night of the incident. We cannot conclude that the additional information of another shove would have compelled the jury to return a verdict less than premeditated murder. It is not the Court's function to "'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" Henley, 960 S.W.2d at 579 (quoting Hellard, 629 S.W.2d at 9). Counsel's decisions for pressing examination of these witnesses was a prudent tactic which cannot be attacked in this situation. The Petitioner has failed to establish prejudice. He is not entitled to relief on these grounds.

-31-

### 4. Failure to properly select a jury.

The Petitioner contends that trial counsel's performance failed to ensure that the empaneled jury was unbiased and able to fully consider the case. Specifically, the Petitioner alleges that trial counsel's voir dire of the venire was deficient in that the questioning prevented counsel from determining whether jurors could give meaningful consideration to the mitigation evidence. The Petitioner contends that this deficiency resulted in permitting two biased jurors to remain on the jury. Specifically, the Petitioner complains that counsel only asked potential jurors about alcohol once. Moreover, trial counsel accepted a juror whose cousin was killed by a drunk driver without asking any follow up questions. Trial counsel accepted another juror who was the victim of domestic violence by her husband and separated from her husband less than three years earlier. Petitioner further asserts that trial counsel failed to employ all peremptory challenges and therefore lost the opportunity to challenge the competence of jurors on appeal.

Mr. Ozment testified that Mr. Ball conducted voir dire. He related that Mr. Ball's decision whether to excuse a juror was based on the individual's demeanor and tone together with Mr. Ball's subjective feeling of connection with the juror. The trial record reveals that the State posed general questions to the jury regarding both the role of a man and the role of a woman in a marriage and alcoholism and/or intoxication. Juror Brown responded that she had been the victim of domestic violence. The prosecutor asked Juror Brown whether she could put that out of her mind for this case. Juror Brown responded that she could "[b]ecause all my anger is toward my husband." Juror Brown continued to aver her position that, regardless of her personal situation, if the State did not prove the Petitioner guilty beyond a reasonable doubt, she could not find the Petitioner guilty. Juror Usoff testified that she had a cousin killed by a drunk driver. When questioned by the prosecutor as to whether the fact that her cousin was killed would influence her decision in this case, Juror Usoff responded that "it's something you don't forget" and "[i]t's in the back of your mind all the time." Juror Usoff further indicated that she grew up near Irene's Bar.

The failure to make certain inquiries to determine how receptive the jury would be as to specific mitigating circumstances during voir dire does not necessarily constitute ineffective assistance of counsel. See generally State v. Goodwin, 703 N.E.2d 1251, 1257 (Ohio 1999). The scope of voir dire is a tactical decision. See Butler v. State, 789 S.W.2d 898, 901 (Tenn. 1990). It is not within the province of the court to second-guess strategic and tactical choices made by trial counsel. Id. at 900. In the present case, both jurors were questioned as to their ability to disregard their personal experiences and to follow the law. The Petitioner has offered no evidence to establish that the jury ultimately empaneled was biased or unfair. The Petitioner has failed to establish any prejudice by counsel's failure to

-32-

more thoroughly question potential jurors.  The Petitioner is not entitled to relief on this claim.

**5.  Failure to correct implications of the State's proof that Lieutenant Nichols was alone at the time of the oral statement.**

For judicial economy and brevity, the Petitioner's claims regarding counsel's performance related to the admission of the Petitioner's typewritten statement are discussed contemporaneously with his other constitutional challenges to the statement's omission at trial, see infra, Section IV (B).

**C.  Penalty Phase Deficiencies**

The Petitioner claims that trial counsel, James Ball and Joseph Ozment, failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions.   In this regard, Petitioner asserts that counsel denied him effective representation by counsel by breaching acceptable standards for capital representation at the penalty phase in that:

1.  Trial counsel failed to present testimony of the Petitioner's compelling life story.
2.  Trial counsel failed to investigate the prior conviction used as an aggravating circumstance.

**1.  Failure to Introduce Mitigating Evidence**

During the penalty phase, the Petitioner presented the testimony of three witnesses: Regina Holbach and Carolyn Darnell, the Petitioner's sisters, and William Powers, a co-worker.  Ms. Holbach testified that the Petitioner was one of eight children in their family. She stated that "[the Petitioner] is my brother, and I love him very much, and I would hope that you would spare his life."   Carolyn Darnell testified that she was aware that the Petitioner and Betty Keough had "a very stormy relationship from the beginning," explaining that they "[f]ussed" and "[f]ought."   She stated "I would just like to plead for leniency. . . . He is my brother and I love him.  And I think that he can overcome his situation and be rehabilitated."  Ms. Darnell stated that she was aware that the Petitioner had some health problems but was not aware whether they were serious.  She knew that he had surgery to help something that was wrong with his stomach.  She also explained that he had a broken jaw several years ago.   William Powers testified that he worked with the Petitioner at a body shop. He stated that the Petitioner was good at his job.  He also had the opportunity to meet Betty Keough.   He recalled an incident that occurred "[a]bout a month maybe before Christmas."  He related that Betty Keough had come to the body shop and was arguing with

the Petitioner. "[S]he pulled out and grabbed his air ratchet and rared [sic] back, and I went to the office and had Miles come out and get it from her." Mr. Powers explained that the argument was over the car that the Petitioner had bought for Betty Keough.

The Petitioner submits that counsel was ineffective for failing to convey information to the jury that (1) he grew up in poverty and was exposed to alcohol and violence, (2) the Petitioner's older brother was also a violent alcoholic, and (3) the Petitioner was a good auto body man but alcoholism interfered with his work. The Petitioner asserts that had the jury been privy to information of his background story combined with expert testimony as to the Petitioner's mental, physical, and psychological condition, there would be a reasonable probability that the jury would have returned a sentence less than death.

In death penalty cases, the sentencer may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964-65 (1978) (plurality opinion); see also Johnson v. Texas, 509 U.S. 350, 361, 113 S. Ct. 2658, 2666 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. See California v. Brown, 479 U.S. 538, 541, 107 S. Ct. 837, 839 (1987); Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982). "'[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse.'" Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (quoting Brown, 479 U.S. at 545, 107 S. Ct. at 841) (O'Connor, J., concurring)).

There is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). In fact, in many death penalty cases, counsel has properly decided not to offer any evidence at the penalty phase. Id. at 421; see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985). Although there is no absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary. Strickland, 466 U.S. at 691, 104 S. Ct. at 2052. Counsel's duty to investigate derives from counsel's basic function which is "to make the adversarial testing process work in the particular case." Kimmelman, 477 U.S. at 384, 106 S. Ct. at 2066. The adversarial testing process will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies. In this regard, counsel is under a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. Id. at 384, 106 S. Ct. at 2066.

In determining whether counsel breached this duty, counsel's performance is reviewed for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time. Wiggins, 539 U.S. at 523, 123 S. Ct. at 2527. Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Id. at 533, 121 S. Ct. at 2381. Neither is counsel required to interview every conceivable witness. Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. See Washington v. Watkins, 655 F.2d 1346 (5th Cir. 1981). Counsel's performance will not be found deficient for failing to unveil all mitigation evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. See Babbit v. Calderon, 151 F.3d 1170, 1174 (9th Cir. 1998). A tactical decision not to pursue one course or another should not be confused with the duty to investigate. In summary,

> no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477, 120 S. Ct. 1029, 1034-35 (2000) (internal citations and quotations omitted).

In addressing attorney performance, courts must be mindful not "to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" Henley, 960 S.W.2d at 579. A court reviewing counsel's performance should "eliminate the distorting effects of hindsight ... [and] evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." Goad, 938 S.W.2d at 369. On the other hand, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." Id.

In now familiar language, the Supreme Court in Strickland linked the deference afforded counsel's choices and decisions to the reasonableness of the investigation supporting the choices and decisions, stating as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that

-35-

reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

Cauthern v. State, 145 S.W.3d 571, 600-01 (Tenn. Crim. App. 2004) (citing Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066).

A reasonable investigation does not require that counsel leave no stone unturned. The reviewing court must consider the limited time and resources of counsel. Reasonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources. Additionally,

the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . . In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland, 466 U.S. at 691, 104 S. Ct. at 2066; see also Nichols, 90 S.W.3d at 587.

At the post-conviction hearing, the Petitioner presented the testimony of Joseph Crenshaw, Bobby Holley, Tom Martin and Dallas Moore. The testimony of these witnesses established that the Petitioner was a good auto body person. They also stated that the Petitioner appeared to have an alcohol problem, stating that the Petitioner would often drink during the lunch hour and would not want to work when he returned. Bobby Holley testified that the Petitioner was the type of individual who never appeared drunk but who was always drinking. Dallas Moore stated that the Petitioner's drinking made him dangerous. Tom Martin's testimony that the Petitioner would become threatening and out-of-control corroborated the testimony of Dallas Moore.

Several of the Petitioner's siblings testified at the post-conviction hearing. His siblings provided a brief description of their childhood. They stated that they were poor and did not have running water or electricity. The Petitioner's sister, Eleanor Raley, explained, however, that everyone else was poor too and their family had love. The Petitioner's siblings further related that their father drank quite often and that he would become argumentative when he drank. Their father was often violent towards their mother. They also related that their father started giving the Petitioner mint gin when he was approximately five years of age. They described their brother Charles as an alcoholic as well. They said Charles would get mean and would want to fight. All three siblings who testified at the post-conviction

hearing admitted that they were never in regular contact with the Petitioner during his adult life.

The post-conviction court determined that the value of the proposed mitigating evidence is far from overwhelming. The court recognized that, although the jury may have heard information about the Petitioner's alcoholism and depression, the jury could have also been presented with evidence regarding the Petitioner's previous violent altercations with his first wife.

Even assuming *arguendo* that the mitigating evidence presented at the penalty phase of his trial was extremely weak, based upon the testimony provided by the Petitioner's family members at the post-conviction hearing and the relative strength of the statutory aggravating circumstance found by the jury, we are unable to conclude that the sentence would not have been the same. Henley, 960 S.W.2d at 579-80. There is no reasonable expectation that the ingestion of alcohol, no matter the amount and over what period of time, will be considered as a mitigating factor rather than an aggravating circumstance. Indeed, there is just as much likelihood that the jury would react negatively to the Petitioner's knowing aggravated use of alcohol over the years and his failed attempt at rehabilitation. An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence clearly presents a double-edged nature. See, e.g., Kitchens v. Johnson, 190 F.3d 698, 702-03 (5th Cir. 1999) (finding that counsel's decision not to investigate mitigating evidence of child abuse, alcoholism, and mental illness was sound trial strategy); Jones v. Page, 76 F.3d 831, 846 (7th Cir.) (noting that failure to introduce evidence of the defendant's long history of substance abuse "was a reasonable tactical choice because such evidence was a 'double-edged sword,' that is, it could easily have been considered either aggravating or mitigating evidence"), cert. denied, 519 U.S. 951, 117 S. Ct. 363(1996). While this Court does not discount as irrelevant the economic, social, and in some ways moral poverty experienced by the Petitioner during his lifetime, this Court is unpersuaded that any substantial portion of society shares the belief that persons disadvantaged in the way the Petitioner describes results in a reduced culpability for their actions.

The Petitioner further asserts that the United States Supreme Court's recent ruling in Porter v. McCollum, 558 U.S. –, 130 S. Ct. 447 (2009), is dispositive as to whether counsel's failure to present certain mitigating evidence during the penalty phase was prejudicial. The defendant George Porter, Jr., was convicted in 1987 of murdering his former girlfriend, Evelyn Williams, and her boyfriend, Walter Burrows. Porter represented himself for part of the trial. Near the completion of the State's case-in-chief, Porter decided to plead guilty. He also changed his mind about representing himself. The court appointed his standby counsel as counsel for the penalty phase. Counsel had never represented a defendant in a capital sentencing proceeding, did not interview any of Porter's relatives and did not obtain any

school, medical or military service records. The total of the mitigating evidence presented by the defense consisted of inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son. Porter, 558 U.S. at –, 130 S. Ct. at 449. Porter subsequently sought post-conviction relief. At the two day evidentiary hearing, Porter presented evidence of (1) his abusive childhood, during which Porter was often "his father's favorite target," (2) his heroic military service in "two of the most critical- and horrific battles of the Korean War," (3) Porter's "struggles to regain normalcy upon his return from war," (4) his long-term substance abuse, and (5) his impaired mental health and mental capacity. Id. at –, 130 S. Ct. at 449-454. The Court stressed the significance of Porter's military service, noting that "Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did." Id. at – , 130 S. Ct. at 455. The Court continued, "the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter." Id. The Court determined, as had previously been noted by two dissenting Florida Supreme Court justices, "there exists too much mitigating evidence that was not presented to now be ignored." Id. (citing Porter v. State, 788 So.2d 917, 937 (Fla. 2001)(Anstead, J., concurring in part and dissenting in part)).

While we do not disagree that there are similarities in the nature of the crimes for which Porter and the Petitioner were convicted, we note that there are striking differences in counsel's performance and in the nature and amount of mitigating evidence not presented at the penalty phase. There is no evidence that the Petitioner suffered from physical abuse as a child. While the Petitioner maintains that his father's act of providing the then five-year-old Petitioner with "mint gin" was abuse, even if this action constituted "abuse," we would be constrained to conclude that this type of abuse had some prominent relationship to the circumstances of the crime committed. More importantly, nothing in the record indicates that the Petitioner ever served in the military, much less during combat, or would be entitled to any leniency accruing from that service. Nothing in the record indicates that the Petitioner suffers from any sort of post-traumatic stress disorder. The mitigating evidence unearthed in Porter's case is far more compelling than that presented at the Petitioner's post-conviction hearing. Accordingly, the Petitioner's case is clearly distinguishable from Porter's.

The Petitioner must make a showing of prejudice based upon the aggravating and mitigating evidence. Considering the strength of the aggravating circumstance and the nature and impact of the mitigating evidence, we cannot conclude that the mitigating circumstances gathered and presented at the Petitioner's post-conviction evidentiary hearing would have altered the balance of aggravating and mitigating factors in this case and changed the outcome of the sentencing proceeding.

**2.   Failure to Investigate Circumstances of Prior Conviction Used as an Aggravator**

The Petitioner asserts that trial counsel were ineffective for failing to investigate the circumstances of the prior conviction used as an aggravator. The Petitioner asserts that had counsel explained the circumstances of this offense there is a reasonable probability that the Petitioner would not have received a sentence of death. The Petitioner relies upon Rompilla v. Beard, 545 U.S. 374, 393, 125 S. Ct. 2456, 2469 (2005), holding that trial counsel's failure to examine the defendant's prior conviction file constituted deficient performance. In Rompilla, the United States Supreme Court held that the failure of capital counsel, who did not represent the defendant on his prior felony charges, to examine the public files pertaining to the defendant's prior felony convictions when the prosecutor made it known that it intended to use that record at the capital sentencing hearing constituted ineffective assistance of counsel. Rompilla, 545 U.S. at 393, 125 S. Ct. at 2469. The Supreme Court determined that counsel's failure to examine the "readily available file . . . seriously compromis[ed] [the defendant's] opportunity to respond to a case for aggravation." Id. at 385, 125 S. Ct. at 2465.

At the penalty phase, the State presented evidence of two prior convictions. First, the State presented the testimony of Marla Simmons, a deputy clerk in the Shelby County Criminal Court. Ms. Simmons testified that, on March 13, 1974, the Petitioner was convicted of assault to commit voluntary manslaughter. The State also presented the testimony of Lucy Carpenter, the Circuit Court Clerk from Marshall County, Mississippi, who stated that the Petitioner had entered a guilty plea to manslaughter in August 1989. On re-direct examination, the State asked Ms. Carpenter whether she was familiar with some of the facts of the case, specifically relating to the fact that the Petitioner was able to post bond. The defense objected and the State withdrew the question. The State was then able to elicit from Ms. Carpenter that the victim of the crime was the Petitioner's brother-in-law.

At the post-conviction hearing, testimony was elicited establishing the circumstances surrounding the Petitioner's Mississippi conviction for manslaughter. Chief Looney testified that the scene of the offense was a mobile home with no electricity. The victim, the Petitioner's brother-in-law, was alive at the time of Chief Looney's arrival on the scene. The Petitioner and two other adults were present and clearly inebriated. The kitchen table was littered with beer cans. In fact, one of the women sitting at the table was still drinking upon the arrival of the police. The Petitioner asserts that these circumstances should have been offered to lessen the weight of the prior conviction. (Appellant's brief at 56 citing American Bar Association, American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1027 (2003) (Guideline 10.7, commentary)).

The present case is easily distinguishable from Rompilla. In Rompilla, the file of the underlying conviction contained information regarding the defendant's troubled upbringing and mental illness about which defense counsel was previously unaware. Rompilla, 545 U.S. at 389, 125 S. Ct. at 2456. The only evidence presented at the post-conviction hearing as to what information the file in the Petitioner's Mississippi case would have disclosed is evidence that the Petitioner, along with everyone else present at the mobile home, was inebriated at the time of the shooting. It remains total speculation and conjecture as to whether introducing these facts to the jury would have lessened the impact of the Petitioner's conviction for manslaughter. Moreover, the Petitioner cannot show prejudice. As to each of his prior convictions, the jury was informed that the Petitioner was convicted of a lesser offense than originally charged. In the Shelby County case, the Petitioner was originally indicted on a charge of assault with intent to commit first degree murder. His conviction reflects a charge of assault to commit voluntary manslaughter. In the Mississippi case, the Petitioner was indicted on a charge of murder. The Petitioner entered a plea to manslaughter. The nature of the conviction reflects some of the mitigating circumstances of the offense. Moreover, the Petitioner apparently disregards established precedent that the prior violent felony aggravator is "more qualitatively persuasive and objectively reliable" than the other circumstances provided for in the capital sentencing statute. See State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993). There is no reasonable probability that had the jury heard the circumstances of the Petitioner's Mississippi conviction that the jury would have imposed any sentence other than death. The Petitioner is not entitled to relief on this claim.

**D. Appellate Deficiencies**

The Petitioner asserts that counsel were ineffective on appeal. The Petitioner begins by conceding that "counsel is not required to argue every issue on appeal." Cooper v. State, 849 S.W.2d 744, 746-47 (Tenn. 1993). He argues, however, that this general principal should not be so narrowly construed to preclude relief especially when the sentence imposed is so severe. The Petitioner continues to cite as error the following omissions of appellate counsel: (1) counsel was ineffective for failing to adequately argue issues concerning the admissibility of Roy Keough's typewritten statement, (2) counsel was ineffective for failing to argue that the death penalty is unconstitutional and (3) counsel was ineffective for failing to raise various issues challenging the constitutionality of the death penalty.

The same principles apply in determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must prove that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal and (2) absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful before the state's highest court. E.g., Smith v. Robbins, 528

U.S. 259, 285, 120 S. Ct. 746, 764 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994). To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) (citing Kimmelman, 477 U.S. at 375, 106 S. Ct. at 2574). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Id. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. Id. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. Carpenter, 126 S.W.3d at 888 (citation omitted). Additionally, ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal. One reason for this is that the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

### 1. Failure to Raise Issues on Appeal

Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986), established a test for determining whether counsel was deficient in Strickland terms for failing to raise particular claims on direct appeal, i.e,

> [s]ignificant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective counsel be overcome.

In Carpenter v. State, our supreme court refused to hold that the Gray v. Greer standard was the conclusive test of finding deficient performance. Carpenter, 126 S.W.3d at 888. Our supreme court noted that the relative strength of the omitted issue is only one among many factors to be considered. Indeed, the court noted the numerous factors relied upon by the Sixth Circuit Court of Appeals in evaluating appellate counsel's failure to raise issues. Id. The non-exhaustive list includes:

1) Were the omitted issues "significant and obvious"?
2) Was there arguably contrary authority on the omitted issues?
3) Were the omitted issues clearly stronger than those presented?
4) Were the omitted issues objected to at trial?
5) Were the trial court's rulings subject to deference on appeal?
6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7) What was appellate counsel's level of experience and expertise?

8)  Did the petitioner and appellate counsel meet and go over possible issues?
9)  Is there evidence that counsel reviewed all the facts?
10) Were the omitted issues dealt with in other assignments of error?
11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Carpenter, 126 S.W.3d at 888 (citing Mapes v. Coyle, 171 F.3d 408, 427-28 (6th Cir. 1999)). Our supreme court acknowledged that the Sixth Circuit's final factor reaches the ultimate issue under the first prong of Strickland and is, therefore, not helpful in deciding whether appellate counsel's performance was deficient.

Again, Petitioner complains that appellate counsel failed to raise issues concerning the constitutionality of the death penalty, *i.e.* (1) the death penalty is arbitrarily imposed, (2) the death sentence is invalid because the aggravating factor was not included in the indictment, (3) the sentence of death infringes upon the Petitioner's fundamental right to life, and (4) the sentence of death violates international law and the Supremacy Clause of Article VI of the United States Constitution. These issues have been rejected by the appellate courts of this state on numerous occasions and are discussed in Section V of this opinion. Petitioner cites no new authority requiring reversal of this precedent.

An appellate attorney is neither duty bound nor required to raise every possible issue on appeal. Carpenter, 126 S.W.3d at 887 (citing King v. State, 989 S.W.2d 319, 334 (Tenn. 1999)); Campbell, 904 S.W.2d at 596-97. Counsel elected not to raise issues which were well-settled in the law at the time. See generally Cooper, 849 S.W.2d at 757 (standard practice for advocates to weed out weak arguments to focus on one central issue). An attorney's determination as to the viability of the issues should be given considerable deference. Carpenter, 126 S.W.3d at 887; Campbell, 904 S.W.3d at 597. Application of the Mapes' factors indicates that counsel's decision was not deficient. Accordingly, no prejudice resulted. Petitioner is not entitled to relief as to his claim that appellate counsel was ineffective for failing to raise these constitutional issues.

## 2.  Failure to Properly Argue Issues

The Petitioner argues that counsel failed to adequately argue issues concerning the admission of the Petitioner's typewritten statement and that the death penalty is unconstitutional. At the Petitioner's trial, the State did not introduce the Petitioner's typewritten statement. Rather, the State relied upon Detective Nichols' recitation of what occurred during the initial interview with the Petitioner. On direct appeal, defense counsel argued that the trial court erred by refusing to permit defense counsel to cross-examine Detective Nichols about the typewritten statement taken by Sergeants Sullivan and Stewart.

At trial, Detective Nichols testified as to the Petitioner's oral statement. The defense sought to cross-examine Detective Nichols by introducing the typewritten statement. The defense theory on appeal was that the typewritten statement was merely a continuation or reduction to writing of the oral interview conducted by Detective Nichols. See State v. Roy E. Keough, No. 02C01-9708-CR-00317 (Tenn. Crim. App., at Jackson, Jan. 13, 1999), aff'd by, 18 S.W.3d at 175. The supreme court determined that the trial court did not err in finding that the defendant, in essence, gave two statements. Keough, 18 S.W.3d at 183. In so concluding, the court noted that the statements were given to different officers and the Petitioner was read his Miranda rights before each statement. Id. Furthermore, the court concluded that Detective Nichols did not have personal knowledge of what the Petitioner told Sergeants Sullivan and Stewart. The court further noted that "the defendant is not entitled to relief on this issue because there was other evidence in the record that the victim had threatened to kill the defendant on the day in question." Id. The Petitioner now asserts that counsel's failure to inform the appellate courts that Sergeant Sullivan was present for both the oral and written portions of the statement deprived him of his right to the effective assistance of counsel on appeal.

An appellate court is not a fact-finding court. In other words, an appellate court is limited to review only those facts contained in the record. See Tenn. R. App. P. 13(c). The trial transcript is absent any reference to the fact that Sergeant Sullivan was present during the initial oral statement given by the Petitioner. Indeed, during the discussion at trial over the admission of the typewritten statement, counsel stated, "This gentleman here [Nichols] started an oral confession. He got a call, and he handed it over to the other two officers there." Regarding the statement, the trial court determined that "you can get [the typewritten statement] in . . .[b]ut you are not going to do it through this officer in front of this jury." Nothing in the transcript of the testimony of the trial indicates that Sergeant Sullivan was present during both the oral statement and the typewritten statement. Indeed, at the post-conviction hearing, Sergeant Sullivan testified that he was not certain whether he was present for the oral statement given by the Petitioner on December 25, 1995. Notwithstanding, the typewritten report introduced for identification purposes only did indicate that "Mr. Keou[g]h agreed to give a typewritten statement regarding what he had told Sgts Nichols and Sullivan." The typewritten report suggested that both Detective Nichols and Sergeant Sullivan were present at the time of the first statement. As the Petitioner raises this same issue in additional contexts, we elect to address the claims regarding the admissibility of the Petitioner's statement collectively in section IV of this opinion, *infra*.

The Petitioner also complains that defense counsel failed to properly assert on appeal argument supporting the pre-trial motions seeking to declare the death penalty unconstitutional. Defense counsel's argument, in the appellate brief, is as follows:

As the Court has previously addressed the issues raised in the pretrial motions, the Defendant relies on and adopts the authorities cited and arguments made in his pre-trial motions, specifically but not limited to the following:

(1) Motion to Dismiss the Indictment Due to the Illegality and Unconstitutionality of TCA 39-13-203 and 39-13-203 and 39-13-205 and the Imposition of the Death Sentence

(2) Motion to Dismiss on the Grounds that Electrocution constitutes Cruel and Unusual Punishment

(3) Motion to Dismiss.

In three separate pre-trial motions, defense counsel made eighteen challenges to the constitutionality of the death penalty, including but not limited to arguments that (1) the death penalty violates double jeopardy, (2) the introduction of hearsay evidence during the penalty phase is unconstitutional, (3) the death penalty statutes are vague and overbroad, (4) electrocution constitutes cruel and unusual punishment, and (5) that proportionality review is inadequate. The individual arguments are supported by over forty pages of legal argument. On direct appeal, a panel of this Court determined that the issues raised had previously been determined adversely to the Petitioner. See State v. Roy E. Keough, No. 02C01-9708-CR-00317. It is not uncommon for counsel in death penalty litigation to raise constitutional challenges to the death penalty that have been previously determined adversely to their position. It is common practice to raise the issues to preserve them for future review. The grounds relied upon by defense counsel in the present case were thoroughly presented in the pre-trial motions. Moreover, it is understood that these issues were raised merely to preserve them for future review. The Petitioner is not entitled to relief on this issue.

## III. Prosecutorial Misconduct

The Petitioner complains that the State denied him his fundamental right to a fair trial by charging him with first degree murder and seeking the death penalty. The Petitioner asserts that, by charging him with first degree murder and subsequently seeking the death penalty, the State engaged in overcharging which was an effective arbitrary use of the death penalty. In support of his argument, the Petitioner asserts the following four fundamental premises: (1) the procedures utilized in seeking the death penalty cannot permit arbitrary and unreliable results, (2) the death penalty must be reserved for only the most serious offenses and the worst of the worst murderers, (3) neither the Petitioner nor the offenses in this case fall within the category of the most serious crimes or the worst of the worst offenders and (4)

overcharging combined with ineffective representation permitted "what is arguably a manslaughter to become capital murder."

First, we note that any error attributed to trial counsel's representation will be discussed within the confines of the Petitioner's claim of ineffective assistance of counsel. The focus of the Petitioner's claim within this allegation lies with a claim of overcharging by the prosecution. In this regard, the nexus of his claim is that the Petitioner is not the "worst of the worst offenders" and that the circumstances of this murder are not within the purview of the most serious of all homicides committed within the state. He cites to comments made by law enforcement officers at the time of the Petitioner's arrest stating that they would recommend a charge of second degree murder. He also cites to the prosecutor's statements that this was not a case that could not have been settled for a plea to second degree murder. Notwithstanding, the Petitioner concedes that the law is settled that the prosecutor has broad discretion in the charging of offenses.

While we appreciate the novel posture in which he advances his argument, it appears upon inspection of his argument that the Petitioner's complaints are nothing more than challenges to the sufficiency of the evidence to support his conviction for first degree murder and the proportionality of the death penalty imposed in this case. On direct appeal, the Tennessee Supreme Court determined that the evidence was legally sufficient to support "a finding that the defendant acted with premeditation." Keough, 18 S.W.3d at 181. Our supreme court further determined that the imposition of the death penalty in this case was not imposed arbitrarily and was not disproportionate. Specifically, the court held that "the similarity of the circumstances to cases in which the death penalty has been upheld, and, in particular, the strength of the aggravating circumstance- the defendant's two prior convictions for violent felonies - reveals that the penalty is not arbitrary or disproportionate as applied in this case." Keough, 18 S.W.3d at 184. It is well-established that post-conviction proceedings may not be employed to raise and re-litigate issues previously determined on direct appeal. See, e .g., Miller v. State, 54 S.W.3d 743, 747-48 (Tenn. 2001). Accordingly, we conclude that the Petitioner is not entitled to relief on these grounds.

## IV. Denial of Right to Fair Trial

The Petitioner asserts that the trial court's failure to permit the jury to hear the contents of the Petitioner's typewritten statement denied him the right to a fair trial and the right to present a defense. In a corollary issue, the Petitioner asserts that the State wrongfully and knowingly manipulated the testimony of Detective Nichols resulting in a Napue violation. See Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173 (1959). In Napue, the United States Supreme Court held that "a conviction obtained through the use of false evidence, known to be such by representatives of the State" deprives a defendant of due process.

Napue v. Illinois, 360 U.S. at 269, 79 S. Ct. at 1177; see also Giglio v. United States, 405 U.S. 150, 153, 92 S. Ct. 763, 766 (1972); State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269, 79 S.Ct. at 1177.

The proof at trial revealed the following circumstances surrounding the Petitioner's statements to law enforcement:

Detective James Nichols encountered the Petitioner in the interview room at the homicide office. The Petitioner advised Detective Nichols that he wanted to speak with his attorney, Leslie Ballin. Detective Nichols contacted Leslie Ballin and did not speak with the Petitioner until Leslie Ballin arrived. Mr. Ballin conferred with the Petitioner and informed Detective Nichols that the Petitioner wished to make a statement. Detective Nichols informed the Petitioner of his Miranda rights and began an interview with the Petitioner. The Petitioner told Detective Nichols that he had found his wife in a bar with another man. He and his wife started arguing and they were asked to leave. Once outside, the argument escalated and he stabbed his wife with a "rifle knife." The Petitioner also admitted to stabbing Berry when Berry intervened. The Petitioner stated that he could not recall how many times he stabbed the victims because "he was angry or something to the effect that his emotions were so high."

The Petitioner then agreed to give a formal typewritten statement. Detective Nichols had to respond to another matter and, therefore, asked two other officers, Sergeants Sullivan and Stewart, to take the statement. This statement was similar to the statement given to Detective Nichols but contained the Petitioner's assertion that Betty Keough carried a gun and had shot at him on an earlier occasion. In this typewritten statement, the Petitioner asserted that both Kevin Berry and Betty Keough had pushed him in the parking lot. The Petitioner also acknowledged a history of domestic violence "both ways" in their marriage. The typewritten statement was introduced for identification purposes only. A typewritten report attached to the exhibit indicated that Detective Nichols and Sergeant Sullivan were present during the oral statement. At trial, the lower court refused to permit the cross-examination of Detective Nichols to venture into the contents of the typewritten statement on the basis that Nichols did not have personal knowledge of what the Petitioner may have told the other officers.

In reviewing this matter on direct appeal, our supreme court determined that the lower court did not abuse its discretion in finding that the defendant, in essence, gave two statements: an oral statement to Detective Nichols followed by a written statement to Detectives Sullivan and Stewart. The court determined "[t]he statements were given to

different officers, and the defendant was read his <u>Miranda</u> rights before giving each statement." <u>Keough</u>, 18 S.W.3d at 183. The court acknowledged that Detective Nichols did not have personal knowledge of what the Petitioner told Sergeants Sullivan and Stewart during the typewritten statement. The court further noted that the State did not call Sullivan or Stewart as witnesses and did not try, otherwise, to introduce the typewritten statement. The court noted that the Petitioner also did not call Sullivan or Stewart as witnesses.

## A. <u>Napue Violation</u>

The Petitioner asserts that the prosecutor's questioning of Detective Nichols during the trial was done in a manner that Sergeant Sullivan's presence during the Petitioner's oral statement was never made known to the trial court. In support of his claim, the Petitioner relies upon the supplemental report which was introduced for identification purposes only during the Petitioner's trial. He contends that this manipulation of the proof amounts to a violation of <u>Napue v. Illinois</u>, 360 U.S. at 264, 79 S. Ct. at 1173.

In the <u>Napue</u> case, Hamer, the principal witness for the State, had testified in response to a question by the Assistant State's Attorney that he had received no promise or consideration in return for his testimony. The Assistant State's Attorney had in fact, as he later admitted, promised Hamer that if he would testify against Napue he would recommend a reduction of Hamer's sentence. Hamer's testimony that he had received no promise or consideration was false and was known by the Assistant State's Attorney to be so. The Assistant State's Attorney did nothing to correct it or to inform the jury of its falsity. The lower court rejected Napue's post-conviction petition, and the Supreme Court of Illinois affirmed, holding that Napue was not entitled to relief because the jury had already been apprised that someone, whom Hamer had tentatively identified as being a public defender, 'was going to do what he could' for him. On appeal to the Supreme Court of the United States the question presented was "whether on these facts the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process of law in violation of the Fourteenth Amendment." Following <u>Mooney v. Holohan,</u> 294 U.S. 103, 55 S. Ct. 340(1935), and <u>White v. Ragen,</u> 324 U.S. 760, 65 S. Ct. 978 (1945), the Supreme Court held that the conviction, obtained through use of false evidence known to be such by the prosecuting attorney, violated Napue's right to due process. The Court further declared that the constitutional infirmity was not removed by the fact that Hamer had testified that an unidentified lawyer from the public defender's office had offered to help him.

In order to prevail on a claim that the prosecution knowingly used false or perjured evidence in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, sections 8 and 9 of the Tennessee Constitution, a defendant must show by a preponderance of the evidence (a) that false or perjured testimony was

admitted at trial, (b) that the state either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial. See Roger Morris Bell v. State, No. 03C01-9210-CR-00364, 1995 WL 113420, *8 (Tenn. Crim. App., at Knoxville, Mar. 15, 1995), perm. to appeal denied, (Tenn. Aug. 28, 1995). Applying this test to the present case, we conclude that nothing in the present case evidences that Nichols' testimony at trial was false or that the prosecutor believed or knew that Nichols had perjured himself. There is no evidence that the prosecution attempted to hide any information from the court or the jury. The Petitioner has failed to meet his burden of establishing any knowing misconduct on behalf of the prosecution in this case. Accordingly, the Petitioner has failed to establish that he is entitled to relief under Napue.

### B. Trial Court Erred in Failing to Admit Typewritten Statement

The Petitioner's argument rests primarily upon his allegation that the trial court and the appellate courts did not consider the fact that Sergeant Sullivan was present at both the oral statement and the typewritten statement. The Petitioner contemporaneously faults trial counsel with failing to establish that Sergeant Sullivan was present at both the oral statement and the typewritten statement, to subpoena Sergeants Sullivan and Stewart, and to couch their argument in terms of the compulsory process clause of the Sixth Amendment.

The most material difference between the Petitioner's oral statement and his typewritten statement is the statement in the latter that Betty Keough carried a gun and previously shot at the Petitioner. The Petitioner sought to introduce this statement to support his theory of self-defense. On appeal, neither this Court nor the Tennessee Supreme Court found that the second statement was a continuation of the oral statement. This Court determined that the typewritten statement was a separate statement for the purposes of admissibility and determined that the trial court did not err in precluding cross-examination of Nichols on the subsequent statement. Moreover, this Court specifically determined that even if the exclusion of the subsequent statement were error, no prejudice enured to the Petitioner because the Petitioner was able to introduce through the testimony of another witness that the victim had claimed to have been carrying a gun and had threatened to kill the Petitioner. Roy E. Keough, No. 020C1-9708-CR-00317. The Tennessee Supreme Court further determined that the oral and typewritten statement were not one continuous statement because the Petitioner was given Miranda warnings before each statement. Keough, 18 S.W.3d at 182. The supreme court also determined that "the defendant is not entitled to relief on this issue because there was other evidence in the record that the victim had threatened to kill the defendant on the day in question." Keough, 18 S.W.3d at 183.

Regardless of the admissibility of the typewritten statement and alleged errors contributing to its exclusion attributed to counsel, we cannot conclude that the Petitioner

suffered prejudice as a result thereof. As noted by our supreme court, there was other evidence in the record that Betty Keough had threatened to kill the Petitioner and that she had a weapon. There is not a reasonable probability that had the jury been privy to the Petitioner's account of Betty Keough's aggressiveness in their relationship that the jury would have altered its conclusion that the Petitioner did not act in self-defense or in the heat of passion. The Petitioner is not entitled to relief on this issue.

## V. Constitutionality of Death Penalty

Petitioner Keough raises numerous challenges to the constitutionality of the death penalty. He concedes that his arguments "are raised for the purpose of <u>federal</u> review." (Emphasis added). The grounds raised are as follows: Tennessee's death penalty scheme is unconstitutional in that unfettered discretion is vested with each individual district attorney general, the indictment in his case violated his constitutional rights in that the aggravating circumstance was not pled in the indictment; the death penalty infringes upon his fundamental right to life; and the death penalty violates his rights under international law and the Supremacy Clause.

The Petitioner's challenges have previously been rejected by courts of competent jurisdiction. As noted by the Petitioner, his arguments are raised for the purpose of federal, and not state, court review. We decline to repeat yet again the analysis and citations which have continuously rejected these arguments. However, we do take the opportunity to point out a rather obvious point in support of the assertion that capital punishment does not violate the Constitutions of the United States and the State of Tennessee. Each document references capital punishment in a manner approving the use of the death penalty. <u>See</u> U.S. Const. amend. V ("[n]o person shall be held to answer for a capital . . . crime unless on a presentment or indictment . . . nor be deprived of life . . . without due process of law. . . ."); Tenn. Const. art I, § 15 ("That all prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or the presumption great."). The Petitioner is not entitled to relief on this ground.

## CONCLUSION

After a thorough review of the record and the law applicable to the issues raised herein, we conclude that the Petitioner has failed to prove allegations contained in his post-conviction petition by clear and convincing evidence. The post-conviction court properly denied the Petitioner relief. Accordingly, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE